The UNITED STATES, Appellant,

v.

JOHNSON CONTROLS, INC., Appellee.

Appeal No. 65–82.

United States Court of Appeals,
Federal Circuit.

Aug. 2, 1983.

son Elec. Const. Co. and Crawford Sprinkler Co. of Raleigh, Inc., amicus curiae.

Before MARKEY, Chief Judge, COWEN, Senior Circuit Judge, and BENNETT, Circuit Judge.

BENNETT, Circuit Judge.

The government appeals from a final decision of the Armed Services Board of Contract Appeals (ASBCA or board), ASBCA No. 25714, 82–1 BCA ¶ 15,779. The ASBCA held that (1) it had jurisdiction under the Contract Disputes Act of 1978 (CDA or Act), 41 U.S.C. §§ 601–613 (Supp. V 1981), to decide a claim brought directly by a subcontractor, Johnson Controls, Inc. (Johnson); (2) Johnson was the proper party to certify the claim under the CDA; and (3) on the merits, Johnson was entitled to an equitable adjustment for the supply of redundant hardware. Since we hold that there was no privity of contract, and thus the ASBCA erred in assuming jurisdiction over Johnson's claim, we do not reach the certification issue and the issue of Johnson's entitlement to an equitable adjustment. We *reverse and vacate.*

*Background*

On May 24, 1977, the Department of Health, Education, and Welfare (now the Department of Health and Human Services) entered into a contract with Turner Construction Company (Turner or the prime contractor) for services in connection with the construction of the National Institute of Environmental Health Sciences permanent laboratory facility in Research Triangle Park, North Carolina. This contract, No. 141–77–0006 (the prime contract), was entitled "Construction Manager Agreement, Construction Manager Services with Guaranteed Maximum Price." The guaranteed maximum price was stated as $65,394,000. Turner entered into approximately 74 subcontracts for the construction work on the project. Turner executed each subcontract in its own name. Although none of the

Stephen G. Anderson, argued, Washington, D.C., for appellant; J. Paul McGrath, Asst. Atty. Gen., and David M. Cohen, Director, Washington, D.C., on the brief; Sherman D. Johnson, Atlanta, Ga., of counsel.

E.D. Gaskins, Jr., argued, Raleigh, N.C., for appellee; Charles C. Meeker, Raleigh, N.C., and Beverly D. Horn, Washington, D.C., on the brief.

David R. Hendrick and Martin R. Salzman, Atlanta, Ga., on the brief for Wat-

subcontracts was executed by the government, each contract was subject to prior government approval.[1]

One of these subcontracts was executed on September 27, 1977, between Turner and Johnson. This subcontract called for the supply and construction of a Central Control Center (CCC) for the temperature control/central monitoring of the facility. This subcontract incorporated the entire prime contract by reference and, in addition, some provisions of the prime contract were physically included. Some of the contract documents referred to Turner as "construction manager" and Johnson as "contractor," while other documents referred to Turner as "contractor" and Johnson as "subcontractor." In addition, the contract contained the following key provision, hereafter referred to as the "ABC" clause:

> Throughout the contract documents . . . reference is made to (a) the Government, Owner and/or Contracting Officer who for this project is the Department of Health Education and Welfare, (b) the Construction Manager, Turner, and/or Contractor, and (c) the Subcontractor, Bid Package Contractor, and/or Contractor.

> A contractual relationship shall exist only between the parties of (a) and (b) and between the parties of (b) and (c). It is not intended to develop a relationship either contractually, administratively, operationally, or in any other manner between the parties of (a) and (c). However, it is the intent of the Construction Manager (b) without establishing a contractual relationship between (a) and (c)

to pass on to the Subcontractor (c) as a tier contractor, the responsibilities the Construction Manager has assumed as defined within the Contract Documents unless specifically noted otherwise and toward this end the dual usage of Contractor is intended and shall be understood.

In June and July 1978, Johnson made submittals for the CCC. Four computers were shown in the submittals. On October 9, 1978, Turner rejected these submittals because, among other reasons, "redundant hardware is not being supplied as specified." Johnson agreed to modify the proposed system to include redundant hardware, but also gave notice of its intention to file a claim for the additional expense that would be incurred. As installed, the CCC system contained seven computers rather than the four computers contemplated by Johnson.

On May 16, 1980, Johnson certified its claim for $221,150, pursuant to the requirements of the CDA, 41 U.S.C. § 605(c)(1). On May 19, 1980, Turner forwarded Johnson's claim to the contracting officer for a decision. Turner joined in the request for a determination under the CDA. Turner, however, declined to certify the claim on the ground that Johnson was the only party who could logically and realistically certify the claim.

On June 9, 1980, the contracting officer accepted the claim, but also informed Turner that he reserved further processing of the claim until Turner certified it. Turner's refusal to certify the claim was not

---

1. At the outset, it should be noted that this case comes to us in an unusual posture—i.e., the board's holding on jurisdiction in this case is exclusively based upon its earlier rulings in *Turner Construction Co.* (hereafter referred to as *"Bristol,"* after the subcontractor whose claim was brought before the ASBCA), ASBCA No. 25171, 81–1 BCA ¶ 15,070, *recon. denied,* 81–2 BCA ¶ 15,186, and *Turner Construction Co. (Industrotech),* ASBCA No. 25447, *recon. denied* (unpublished). Both *Bristol* and *Industrotech* involved appeals by subcontractors in the same construction project that gave rise to

this present appeal. Before the ASBCA, the government, in its motion to dismiss, stated that the issues in *Industrotech* are identical to the issues in this case. *See* 82–1 BCA at 78,-143. The board, however, principally relied upon its ruling in *Bristol* in denying the government's motion to dismiss for lack of jurisdiction. As a consequence, this court will be essentially reviewing the facts and reasoning of the board in the *Bristol* case, as well as the undisputed factual assertions of the parties. Only those facts that are relevant to our holding on the jurisdictional issue will be discussed.

unique to Johnson. At this time, Turner had taken the same position on claims of four other subcontractors.

On July 2, 1980, Turner submitted a report to the contracting officer on the merits of Johnson's claim, as was required by a provision in the prime contract. The report stated, in part:

> We recommend rejection [of the claim], on the basis that what Johnson is identifying as extra cost and beyond their contract requirements is in actuality within the specified scope of work.

On August 13, 1980, however, Turner certified Johnson's claim.[2] The contracting officer still consistently refused to issue a final decision on the merits. On January 13, 1981, Johnson appealed directly to the ASBCA, noting the failure of the contracting officer to issue a decision on its claim. *See* 41 U.S.C. § 605(c)(5). Upon receipt, the board docketed the appeal in Johnson's name.

Before the board, the government brought a motion to dismiss on the ground that Turner had not submitted a valid certification, which was a prerequisite to the board's jurisdiction. Apparently the government felt that Turner's certification of Johnson's claim was invalid because of Turner's earlier statement that Johnson's claim should not be paid. The board denied the government's motion. 82–1 BCA at 78,143. On the merits, the board held that Johnson was entitled to an equitable adjustment for its supply of redundant hardware.

### The Bristol Decision

The board's holding on jurisdiction in this case is based solely upon its earlier holdings in *Bristol* and *Industrotech*.[3] The *Industrotech* decision, in turn, is based upon the reasoning and holding of the board in *Bristol*.[4] A thorough analysis of the ASBCA's holding on jurisdiction in this case, therefore, requires an examination of the board's holding and reasoning in the *Bristol* case. Fortunately, the contract provisions relied upon by the board in the *Bristol* case are identical to the provisions relevant to this appeal; the prime contract is of course the same in both cases, and the provisions of the Turner-Bristol contract relied upon are similarly found in the Turner-Johnson contract.

In order to review the board's holding in *Bristol* that there is privity of contract between the subcontractor and the government, it is necessary to examine the contract provisions in both the prime contract

---

**2.** There is no mention in the board's decision of Turner's certification of Johnson's claim. The government suggests that this omission is a result of the apparent contradiction between Turner's report on the merits and its certification of the claim. A more likely explanation is that in light of the board's holding that Johnson could directly appeal its claim to the board, Turner's certification was not necessary to the board's jurisdiction.

**3.** The ASBCA's decisions in *Bristol* and *Industrotech* dealt only with the government's motion to dismiss for lack of jurisdiction. *See supra* note 1.

**4.** In *Industrotech,* the government contended that the subcontractor was not a "contractor" within the meaning of the CDA, that Industrotech could not certify the claim as a subcontractor, and that Turner had to analyze the claim. The board stated:

"The first two grounds are decided in our decision in [*Bristol*]. In that case the Board found privity of contract between the subcontractor and the Government in the same contract as this instant appeal. Since we held that privity of contract exists, it follows that the party appealing must certify the claim under provisions of the Contract Disputes Act. This holding applies with equal force to this appeal."

The board stated that the government's argument that Turner had a duty to analyze Industrotech's claim did not have to be addressed because this issue was "not germane to the Board's jurisdiction." On the government's motion for reconsideration, the board noted that in *Bristol* "we unequivocally held that 'there is privity of contract between the subcontractor and the Government,' 81–1 BCA at 74,533." The board also noted that the substitution of Industrotech's name for Turner's was a "purely administrative change" to reflect the real party in interest. The motion for reconsideration was therefore denied.

and the subcontract. The following provisions of the prime contract were used to support the board's conclusion that Turner was, in effect, an "agent of the government."

Article 1.1, Purpose and Intent, states: The primary purpose and intent of Activity "B" of this Agreement is to secure the services of a Construction Manager [Turner] to organize and direct the complete construction of the project and to assume all risks and responsibilities of producing the project within a Guaranteed Maximum Price.

Article 3.4 provides, in part: The general function of the Construction Manager is to serve as the Government representative with responsibility directly to the Government. His employment should be such to preclude any conflict of interest.

Article 3.6.1 states: The Government shall be responsible for approving awards of all contracts after evaluation and recommendations by the Construction Manager. After Government approval the Construc-Manager [sic] shall make the award.

*See also* Construction Management Special General Provisions (CMSGP), subparagraph e, Provision 11, Solicitation of Bids, 81–1 BCA at 74,528.

Article 3.7.3 provides with respect to subcontracts: Each trade contract awarded by the Construction Manager is a separate contract awarded on the basis of competitive bidding. These contracts are referred to as subcontracts to conform to insurance terminology utilized in standard insurance policies. For insurance purposes the relationship of the Construction Manager to the trade contractor is the same as that of a subcontractor.

Article 4.6.2 states, *inter alia,* that it is the government's responsibility to maintain an inspection staff at the job site for the inspection of the work of the construction manager and, with Turner's assistance, the work of the separate contractors (i.e., subcontractors). This provision goes on to state that "[t]he Government shall have the sole authority and duty to reject work which does not conform to the contract requirements." The government is also given the power of interpretation of the meaning and intent of the drawings and specifications. *See also* CMSGP, Provision 13, *id.*

In Articles 4.10.1 and 4.10.2 the government is empowered to request changes in the work, or to approve changes proposed by the construction manager. *See also* CMSGP, Provision 18, *id.* The prime contract also contained the same "ABC" clause quoted earlier. The contract included Standard Form 23–A (SF–23A), which contains the standard Changes, Disputes, and Suspension of Work clauses. *See* 41 C.F.R. § 1–16.901–23A (1982). Finally, the prime contract contained Form 36, which includes general provisions of the subcontract form to be used in the bid package subcontracts.

The following provisions of the subcontract between Turner and the subcontractor were relied upon by the ASBCA. Article II provides:

With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to the Owner and to Turner by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward the Owner and Turner all of the duties, obligations and responsibilities that Turner by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that the Owner and Turner shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Turner with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full.

The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcon-

tractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

Article V states, *inter alia,* that in the event the subcontractor is delayed by various factors, an extension of time will be granted, as determined by Turner. This article goes on to state, "In the event of dispute by the Subcontractor, the matter shall be referred to the Architect [i.e., the government] whose decision thereon shall be final and binding upon the parties hereto." *Id.* at 74,529.

Article VIII provides, in part: "The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and Turner. The decision of the Architect as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto."

Article IX states, *inter alia,* that Turner reserves the right to make changes in the work as it may deem necessary, upon written order to the subcontractor. The article further states that should the parties disagree on the value of the work to be changed, then "the determination of the value of the work shall be referred to the Architect whose decision shall be final and binding upon the parties hereto."

The subcontract also included Standard Form 23A, which includes the standard Disputes and Suspension of Work provisions. The Disputes clause provides, *inter alia,* that a dispute concerning a question of fact shall be decided by the contracting officer (i.e., the government's representative), with a right of appeal to an agency board of contract appeals, whose decision is final unless fraudulent, arbitrary or capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. The Suspension of Work provision provides, *inter alia,* that the contracting officer may order a suspension of work "for the convenience of the Government," and provides for an adjustment for any increase in the cost of performance if cer-

tain conditions are met. *Id.* at 74,530. Finally, the subcontract contained the "ABC" clause mentioned earlier.

In its discussion in the *Bristol* case, the ASBCA noted that only in rare cases is a subcontractor permitted to sue the government in its own name, but that "privity results when prime contractors act as Government agents to place subcontracts." *Id.* at 74,532 (citations omitted). The board then went on to state that, in its opinion, "the path to the correct conclusion in this appeal was shown in *Continental Illinois Nat. B. & T. Co. v. United States,* ... 81 F.Supp. 596 [112 Ct.Cl. 563] (Ct.Cl.1949)." *Id.* In *Continental Illinois,* the Court of Claims reviewed the relevant provisions of a prime contract and concluded that:

> These provisions border on creating a privity of contract between the Government and the subcontractor. The subcontractor must be approved in writing and the terms of all subcontracts are made subject to the prior approval of the contracting officer. The subcontractor is also made subject to all the terms of the contract. [81 F.Supp. at 598, 112 Ct.Cl. at 566.]

Regarding a provision in the contract of similar import to the "ABC" provision involved in this case, the court stated:

> It is true that the specifications provide that nothing in the contract documents shall create a contractual relation between the subcontractor and the Government. But this is somewhat like the truant boy who, while admitting that he took, roasted and ate the chicken without the owner's permission, pleaded that he had no intention of depriving the owner of it—he didn't even know the owner. A mere statement that a contractual relation did not exist would be ineffective if all the elements of such a relation were otherwise present. [*Id.*]

The Court of Claims, however, held that the contract provisions were not sufficient to cross the "border" of privity of contract between the subcontractor and the government, and therefore dismissed the claims

brought on behalf of subcontractors. The court stated:

> While the quoted provisions of the contract specifications come near to creating a privity of contract between the Government and the subcontractors, they are in our judgment not sufficient to do so and this court is therefore without jurisdiction under the Tucker Act, 28 U.S.C.A. § 1491 et seq., to consider the claims brought by the plaintiff for the benefit of the subcontractors. [*Id.*]

In contrast to the holding in *Continental Illinois,* the ASBCA in *Bristol* held that the provisions of the prime contract and the subcontract were such that privity of contract was created between the government and the subcontractor. The board stated:

> The provisions of the contracts in this appeal go beyond the "border" of creating privity of contract between the Government and the subcontractor. Here, the Government does not merely approve subcontracts and assure provisions in subcontracts designed to "bind subcontractors to the contractor by the terms of [the prime contract] insofar as applicable." Under the prime contract and subcontract, the Government, *inter alia,* (1) inspects, has sole authority to reject work, and is the required interpreter of the drawings and specifications; (2) makes the decisions concerning equitable adjustments for changes and suspensions of work under subcontracts; and (3) decides disputes under the terms of both the prime contract and subcontract, with the contracting officer defined as the person executing "this contract," *i.e.,* both the prime contract and subcontract, on behalf of the Government. Under the subcontract, the subcontractor agrees, not only with the prime contractor, but by clear implication, with the Government, to be bound by those provisions. It expressly agrees in Article II, quoted above, "to be bound to the Owner . . . ." [81–1 BCA at 74,532–33 (footnote omitted).]

The board concluded that "there is privity of contract between the subcontractor and the Government, and that the subcontractor not only may, but must, certify its claim under the Contract Disputes Act." *Id.* at 74,533. The government's motion to dismiss for lack of jurisdiction was therefore denied.

### Direct Subcontractor Appeals Under the CDA

The literal issue before us is whether the subcontractor, Johnson, may directly sue the government under the CDA.[5] The government asserts that Johnson is not a "contractor," as that term is used in the statute, and therefore the board lacked jurisdiction under the CDA to entertain Johnson's claim.

41 U.S.C. § 601(4) states that "the term 'contractor' means a party to a Government contract other than the Government." From this language, the government concludes that Johnson cannot be a "contractor," as it did not execute a contract with the government, and thus could not be "a party to a Government contract." In support of its contention that subcontractors such as Johnson are not authorized to bring a direct appeal under the CDA, the government cites the following significant passage from Senate Report No. 1118, 95th Cong., 2d Sess. 16–17, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5235, 5250–51, discussing the definition of a "contractor" contained in the CDA.

> The term "contractor" means a party to a Government contract other than the Government.

> The recommendations of the Procurement Commission specifically exclude bringing subcontractors under the provisions of S. 3178. It is expected that the present sponsorship rules would remain in effect. There are a number of advantages in the present sponsorship approach. From the Government's point of view, the sponsorship approach is the best

---

5. Although the subcontract was entered into before the enactment of the CDA, it is undisputed that Johnson elected to treat its claim as one arising under the CDA. *See* 41 U.S.C. § 601, note, and *W.M. Schlosser Co. v. United States,* 705 F.2d 1336 (Fed.Cir.1983).

method of administering complex procurements. By administering its procurement through a single point of contact, the Government's job is made both simpler and cheaper. The single point of contact approach also helps suppress frivolous claims. If direct access were allowed to all Government subcontractors, contracting officers might, without appropriate safeguards, be presented with numerous frivolous claims that the prime contractor would not have sponsored. By forcing the prime contractor to administer its subcontractor network, the Government permits prime contractors and subcontractors at all tiers to use to some extent their familiar commercial procedures in contract award and administration. This advantage should not be underestimated, since the considerable variation between Government and commercial contract administration often requires extensive revisions in the administrative procedures of Government prime contractors and considerable reeducation of contract personnel. Finally, by denying the subcontractors direct access to administrative remedies, the Government is forcing the prime contractor and the subcontractor to negotiate their disputes. Allowing direct access would eliminate some incentive to negotiate a settlement. This might result in additional time-consuming and expensive litigation. The forced negotiation under the present system can create a psychological familiarity between the prime contractor and subcontractor, resulting in a greater likelihood of successful negotiation in future dealings.

On balance, although some inequities presently exist with respect to the treatment of subcontractor claims, these inequities are best handled by improved subcontract administration by the prime contractor with appropriate supervision by the Government. The additional problems of contract administration and program management that would arise if subcontractors were given direct access to the Government in disputes and claims outweigh the benefit to be gained. However, Government contracting agencies must remain alert to problems associated with subcontractor claims and assure that those resulting from Government actions are decided fairly.

The government also points to 41 U.S.C. § 602, which provides, *inter alia,* that the Act "applies to any express or implied contract ... entered into by an executive agency ...." The government asserts that subcontracts under a prime contract between the government and a contractor are, by definition, not entered into by an executive agency. Finally, the government points out that it is only claims by a "contractor" that must be considered by the contracting officer, 41 U.S.C. § 605(a), and only a "contractor" or the government may appeal a contracting officer's decision. 41 U.S.C. §§ 606, 609(a)(1).

Johnson, of course, disputes the government's assertion that the foregoing language of the CDA was designed to operate as an impenetrable bar to a direct appeal by a subcontractor. Johnson largely relies upon the decision of the Energy Board in *A & B Foundry, Inc.,* EBCA No. 118–4–80, 81–1 BCA ¶ 15,161, for the position that a party who enters into a contract with an agent of the government can be deemed to be "a party to a Government contract" for purposes of a direct appeal under the CDA.

In *A & B Foundry,* the board noted that the definition of a "contractor" in the CDA was susceptible to more than one reasonable interpretation. Turning to the legislative history, the board noted that a Senate bill penultimate to the final Senate bill contained the following definition of the term "contractor":

"(4) the term 'contractor' means a party to a Government contract other than the Government; except that such term does not include any third party beneficiary or subcontractor." [81–1 BCA at 75,002, *quoting* S. 2787, 95th Cong., 2d Sess. (1978).]

This language, however, was subsequently deleted in favor of the definition quoted earlier. The board also noted that the Pro-

curement Commission was aware that several agencies permit direct subcontractor appeals. *See* 81–1 BCA at 75,003. From the foregoing, the board concluded:

> Thus, because Congress knew that several agencies provided for direct access to certain types of subcontractors, and because the final wording of the pertinent language of the Act reversed an earlier draft which would have excluded direct appeals by all subcontractors, it must be presumed that Congress did not intend to restrict access only to those subcontractors who would be "sponsored" in their appeals. [*Id.*]

The board held that A & B Foundry, in supplying goods to Union Carbide, a purchasing agent of the government, was a "contractor" under the CDA.[6]

In *Bristol,* the ASBCA also held that the CDA did not bar all subcontractor appeals because the portion of the Senate Report quoted by the government (1) has nothing to do with the certification requirements, and (2) is "not concerned with cases where a prime contractor acts for certain purposes as the Government's agent to contract with others." 81–1 BCA at 74,532.

While we do not find it necessary to decide the correctness of the government's assertion that the language of the CDA was designed to bar all direct appeals by a subcontractor, we think that the preceding discussion illuminates many of the considerations bearing on the issue of privity of contract between the government and a subcontractor. Assuming, for discussion purposes only, that the CDA left intact the pre-existing exceptions to a direct appeal by a subcontractor, an examination of these exceptions leads us to conclude that this case does not present the factors necessary to fall within any recognized exception to the well-entrenched rule that a subcontractor cannot bring a direct appeal against the government.

### Privity of Contract

A brief examination of the judicial history of the privity doctrine in regard to subcontractor claims provides some guidance as to the parameters of this doctrine. In *Merritt v. United States,* 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925), the plaintiff, a subcontractor, sued the United States to recover amounts the government had received from the prime contractor. The Supreme Court denied recovery, stating:

> Plaintiff cannot recover under the Tucker Act .... The petition does not allege any contract, express or implied in fact, by the Government with the plaintiff to pay the latter for khaki on any basis. Nor does it set forth facts from which such a contract will be implied. [*Id.* at 340–41, 45 S.Ct. at 279.]

*See also United States v. Blair,* 321 U.S. 730, 737, 64 S.Ct. 820, 823, 88 L.Ed. 1039 (1944); *Severin v. United States,* 99 Ct.Cl. 435, 442 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *Nickel v. Pollia,* 179 F.2d 160, 163–64 (10th Cir.1950). In *Putnam Mills Corp. v. United States,* 479 F.2d 1334, 1337, 202 Ct.Cl. 1, 4 (1973), the Court of Claims stated:

> It is clear that, unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime. *United States v. Munsey Trust Co.,* 332 U.S. 234, 241 [67 S.Ct. 1599, 1602, 91 L.Ed. 2022] ... (1947); *United States Fid. & Guar. Co. v. United States,* 475 F.2d 1377, [1381, 201 Ct.Cl. 1, 5] ... [ (Ct. Cl.1973) ].

Thus, the no-privity rule is synonymous with a finding that there is no express or implied contract between the government and a subcontractor. This concept of privity is mirrored in the CDA, 41 U.S.C. § 602 ("this chapter applies to any express or implied contract ... entered into by an

---

**6.** In *A & B Foundry,* the parties stipulated that the prime contractor was acting as a purchasing agent for the government. 81–1 BCA at 75,002. Also, the Department of Energy, by regulation, permits direct subcontractor appeals in certain circumstances. *See infra* note 17.

executive agency ..."), and the Tucker Act, 28 U.S.C. § 1491, *amended by* the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 39–40 ("The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States ...").

■ Over the years a number of exceptions have been recognized to the general rule that a subcontractor cannot bring a direct appeal against the government.[7] We will focus only on that exception which the ASBCA, in *Bristol,* found controlling— where the prime contractor was acting as an agent of the government. The board stated:

> The rule that subcontractors normally are not in privity with the Government and, therefore, may not appeal or sue the Government, other than under the "sponsorship" approach, is familiar government contract law. Equally clear, however, although not frequently encountered, are situations in which privity results when prime contractors act as Government agents to place subcontracts. See Sass, Subcontractor's Claims Against the Government, 16 Fed.B.J. 232 (1956); Crowley, Claims of Subcontractors Before The Armed Services Board of Contract Appeals; and the other articles on the subject in The Federal Bar Journal, Part I, Vol. XVI, April—June, 1956. [81–1 BCA at 74,532.]

The articles cited by the board as authority in turn rely on two cases to establish the proposition that there can be privity of contract between the government and subcontractors where the prime contractor is a mere government agent. *Kern-Limerick, Inc. v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), and *Western Union Telegraph Co. v. United States,* 66 Ct.Cl. 38 (1928). But, a recognition of the factual differences between those cases and the one before the court now demonstrates why the

facts in the earlier cases may not be relied upon to support a finding of privity based upon an agency theory in this case. In *Kern-Limerick* and *Western Union* the prime contractor was (1) acting as a *purchasing* agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price. *See* 347 U.S. at 112 n. 2, 74 S.Ct. at 405 n. 2; 66 Ct.Cl. at 50. In the recent Supreme Court case of *United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the Court noted that these same factors, as well as others (e.g., title passed directly to the government), were crucial to their decision in *Kern-Limerick. Id.* at 742, 102 S.Ct. at 1386. *See also Deltec Corp. v. United States,* 326 F.2d 1004, 164 Ct.Cl. 432 (1964), where it was implied that the government could be directly liable to a subcontractor on an agency theory. Again, the three factors enumerated above were present. *Id.* at 1005–06 n. 1, 164 Ct.Cl. at 433 n. 1.

■ None of these crucial factors is present in this case. Even if we assume, for discussion purposes only, that an agency relationship can be implied under the provisions of the prime contract, there is still no contractual provision providing that the government is directly liable to a subcontractor for the goods or services supplied to Turner. As a consequence, we find that the cases cited as support for the agency exception to the no-privity rule are of no relevance to the case before us. Turner was not, therefore, acting as an agent of the government for the purpose of establishing privity between the government and Johnson.

The only court case cited by the board and Johnson to support their position that privity between the government and a subcontractor can exist in a factually similar setting is the 34-year-old case of *Continen-*

---

**7.** We are aware of no case where a court has discussed the effect of the CDA on a direct subcontractor appeal. As mentioned, the ASBCA in *Bristol* and the Energy Board in *A & B Foundry* addressed this issue.

*tal Illinois,* which we mentioned earlier. The dicta of the Court of Claims in that case certainly implied that privity between the government and a subcontractor could be found if the contract provisions circumvent the independent authority of the prime contractor. But the court did not actually find privity. We know of no case, other than the board's own holding in *Bristol,* where privity has been found based upon this theory.

The *Continental Illinois* case also involved an important factor not present in this case—the application of the *Severin* doctrine.[8] In *Continental Illinois,* the subcontractor's claim was being "sponsored" by the prime contractor. The court held that, because of an exculpatory clause identical to that in the *Severin* case, it had no jurisdiction to hear the part of the claim brought by the prime contractor on behalf of the subcontractor. 81 F.Supp. at 597, 112 Ct.Cl. at 565. It is not clear to what extent the court's opinion reflected the fact that the *Severin* doctrine barred the prime contractor's sponsorship of the subcontractor's claim, but it is reasonable to assume that this fact influenced the court's opinion.[9]

■ We reject the board's conclusion that the contract provisions so circumvented the independent authority of the prime contractor that Turner was acting as an agent of the government. It is true that the government here has retained a great deal of control over the actions of Turner in its dealings with the subcontractors on the project. But it is also apparent that the government meant to use Turner as a buffer between it and the claims of the subcontractors. After all, it was Turner that was contractually bound to supervise and complete the construction project for a fixed price. *See* Article 1.1, Purpose and Intent, *supra.* Also, it was Turner, not the government, who rejected Johnson's submittals as being nonresponsive, and required Johnson to provide redundant hardware. The court in *Continental Illinois* held that the contract provisions in that case were not sufficient to create privity between the government and the subcontractor, and we likewise cannot conclude that the contract provisions here are so extraordinary as to mandate a finding of privity.

*Intent of the Parties*

■ A careful analysis of the contract documents leads us to the conclusion that no provision was made for a direct appeal by a subcontractor. There is some merit to Johnson's allegation that the "contract documents are, at best, confusing, and at worst, in conflict, concerning the intention of the parties with respect to the relationship created thereby." The following factors, however, lead us to the conclusion that the contracts do not authorize a direct appeal by a subcontractor: (1) the government and Johnson never entered into a

8. In brief, the *Severin* doctrine, first articulated in *Severin v. United States,* 99 Ct.Cl. 435 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), holds that a prime contractor cannot recover on behalf of a subcontractor unless the prime contractor has reimbursed the subcontractor or is liable to make such reimbursement. In *Severin,* the contract between the prime contractor and the subcontractor contained an exculpatory clause holding the prime contractor harmless from any claim caused by the actions of the government. The court, therefore, held that it had no jurisdiction to hear any claim based upon damages to the subcontractor. In subsequent cases, the application of the *Severin* doctrine has been narrowly construed. *See, e.g., Blount Bros. Construction Co. v. United States,* 346 F.2d 962, 964–65, 171 Ct.Cl. 478, 480–81 (1965).

9. The importance of the application of the *Severin* doctrine to the court's discussion in *Continental Illinois* is highlighted in the dissent by Judge Madden, the author of the *Severin* opinion. In his dissent, Judge Madden focused only on the inequitable results which may flow from the application of this doctrine and the possible conflict with the Supreme Court's opinion in *United States v. Blair,* 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944). 81 F.Supp. at 598–99, 112 Ct.Cl. at 567. It is not clear from the opinion whether the subcontractor had any recourse for the alleged expenses incurred because of government delay, breach of contract, and extra work. In contrast, the subcontractor in this case has (arguably) two other avenues of recovery (besides a direct appeal): (1) sponsorship of its claim by Turner; and (2) an action against Turner on the payment bond.

direct contractual relationship; (2) the "ABC" clause, contained in both the prime contract and the subcontract, specifically disclaimed a contractual relationship between the government and Johnson; (3) Turner was required to obtain a Miller Act payment bond, which provided a recourse by the subcontractor other than a direct appeal; and (4) there is no provision in any of the contract documents that clearly authorizes a direct appeal by a subcontractor.

The first factor, although obvious, is significant in that it clearly identifies Johnson as a "subcontractor."[10] It is also significant to note that it has not been asserted that the subcontract was assigned to the government, *see Brock & Blevins Co. v. United States,* 343 F.2d 951, 170 Ct.Cl. 52 (1965), or that direct dealings between the government and Johnson created privity of contract, *see Seger v. United States,* 469 F.2d 292, 199 Ct.Cl. 766 (1972).[11] Rather, the basis for the board's holding that there was privity between the government and Johnson was that the contract provisions in the prime contract and the subcontract so circumvented the independent authority of the prime contractor that Turner was acting as an agent of the government. This holding, by implication, recognizes that there was no direct contractual relationship between the government and Johnson; if there were, it would not have been necessary to designate Turner as an agent of the government in order to find privity.

The second factor is the inclusion of the "ABC" clause in both the prime contract and the subcontract. Both Johnson and the ASBCA rely on the statement in *Continental Illinois* that "[a] mere statement that a contractual relationship did not exist would be ineffective if all the elements of such a relation were otherwise present." 81

F.Supp. at 598, 112 Ct.Cl. at 566. Although we certainly agree with this statement, it does not detract from our conclusion that the "ABC" clause is an important, if not determinative, factor in our analysis of the intent of the parties as seen through the contract documents. The "ABC" clause unequivocally states that no contractual relationship shall exist between the government and the subcontractors. Furthermore, the government asserts, and Johnson does not refute, that this clause was specially negotiated for inclusion in the prime contract and the subcontracts, as opposed to being merely "boilerplate" language. *See Ball State University v. United States,* 488 F.2d 1014, 1016, 203 Ct.Cl. 291, 294 (1973). At the very least, this clause should have put Johnson on notice that the government would resist any direct appeal by a subcontractor.

The third factor favoring lack of privity is the requirement in the prime contract that Turner obtain a Miller Act payment bond. The Miller Act, 40 U.S.C. §§ 270a–270f (1976), requires, *inter alia,* that a prime contractor undertaking construction of a public building furnish a performance bond "for the protection of the United States" and a payment bond "for the protection of all persons supplying labor and materials." 40 U.S.C. § 270a. Under 40 U.S.C. § 270b, a subcontractor is given the right to bring an action in district court against the prime contractor for amounts justly due. Under the prime contract, Turner was required to obtain a payment bond in the amount of $33,153,450 (approximately 50 percent of the total contract price).

■ As the government points out, the general purpose of the Miller Act is to protect subcontractors against nonpayment,

---

10. Johnson argues that we should categorize the relationship of the parties as "owner" (the government), "construction manager" (Turner), and "contractor" (Johnson), rather than "owner," "prime contractor," and "subcontractor." Throughout this opinion, we have labeled Turner the "prime contractor" and Johnson a "subcontractor." This characterization of the parties is merely designed to reflect the fact that Turner executed a contract with the government, while Johnson did not. This labeling is

not meant to determine our ultimate legal conclusion that Johnson is not in privity with the government.

11. In *Seger,* the court did not find privity on the basis of direct dealings between the government and the subcontractor, as it found that such a claim was not substantiated by the evidence. 469 F.2d at 300–01, 199 Ct.Cl. at 774.

as it is generally recognized that a subcontractor cannot directly sue the government and cannot obtain a lien against property supplied to the government. *See United States v. Munsey Trust Co.*, 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947). It would seem anomalous for the government to require that Turner supply the payment bond, with the great expense involved (a portion of which is undoubtedly passed on to the government) if it were contemplated that Johnson and the other bid package subcontractors were "contractors" with a right of direct appeal against the government. Whatever else may be gleaned from the existence of the Miller Act bond, one thing is clear: Johnson was provided with a means of recourse other than a direct action against the government.[12]

The final factor in our analysis of the intent of the parties is the absence of any clear contractual consent for direct subcontractor appeals. We emphasize "clear" consent, as certain provisions of the contracts make it difficult to define what the parties envisioned. Johnson points to two provisions, one in the subcontract and the other in the prime contract, that it asserts provide for direct subcontractor appeals.

First, Johnson points out that the standard Disputes clause of SF–23A was physically incorporated in the subcontract. Prior to the enactment of the CDA, the Disputes clause constituted the contractual basis upon which a contractor could bring a claim against the government to a board of contract appeals. If, as Johnson asserts, the purpose of the inclusion of the Disputes clause in the subcontract was to permit the presentation of subcontractor claims to the contracting officer with a right of appeal to a board of contract appeals, then a strong

argument could be made that the parties intended to permit a direct appeal by Johnson rather than recourse to Turner, the prime contractor. Although the subcontract was executed by Turner and Johnson, it should be remembered that all subcontracts were subject to prior government approval. Also, it appears that not only was the government aware of the inclusion of the Disputes clause in the subcontract, but it also consented to its use.

The reason for the inclusion of the Disputes clause in the subcontract is the subject of conflicting affidavits proffered by the parties. The government relies on an affidavit of Robert W. Schmidt, a principal government representative during the negotiation of the prime contract.[13] Mr. Schmidt states that Turner wanted SF–23A (which includes the Disputes clause) included in the subcontracts for "informational" purposes only, and asserted that no privity of contract or any other relationship would thus be created between the government and the subcontractors. Mr. Schmidt further asserts that Turner and the government then agreed to include the "ABC" clause in both the prime contract and the subcontracts to make this clear.

Johnson, however, asserts that the Schmidt affidavit is contradicted by an affidavit of James E. Yarbrough, the contracting officer for the prime contract. Mr. Yarbrough states that SF–23A was included in the *prime* contract "to provide a comprehensive statement of the parties['] rights under the contract and to provide comprehensive remedies to be determined in accordance with the administrative disputes procedure." This statement, however, clearly refers only to the government and Turner; no mention is made of the rights of subcontractors. Mr. Yarbrough also states:

---

**12.** The government asserts that the board's assumption of jurisdiction over this case "creates an unnecessary and irreconcilable conflict" between the CDA and the Miller Act. Johnson, on the other hand, asserts that the existence of two different remedies (direct action suit and suit under the Miller Act) merely provides the subcontractor with alternate forums in which to pursue its claim. For the purposes of this opinion, we are content to view simply the

Miller Act remedy as a reflection of the intent of the parties, rather than a categorical bar to alternate avenues of relief.

**13.** This affidavit, as well as the Yarbrough affidavits discussed, are part of the record in the *Bristol* case, which the board relied upon in this case in deciding the jurisdictional issue here.

Prior to the award of any of the separate construction contracts, the Government reserved the right to review and did review the proposed awards. The Government approved the proposed award with Central [another bid package contractor] and thereby authorized Turner to contract with Central. It is our understanding and expectation that all claims or differences between Turner and Central would be submitted to me for determination in my role as Contracting Officer.

This statement is directed to Articles V, IX, and X of Turner's standard subcontract forms, which deal with claims for extensions of time, additional compensation for changes, and disputes regarding inspection, not the inclusion of SF–23A. Furthermore, the government points to yet another affidavit of Mr. Yarbrough in which he states that SF–23A "pertains to disputes solely between Turner and the Government. The clause may be used by Turner's subcontractors but only to the extent that the subcontractor's claim is processed in the name and through Turner." The contracting officer described himself as authorized by the prime contract to be an arbitrator between Turner and the subcontractors and that, therefore, his decision would not be appealable to the board of contract appeals.

Finally, Johnson relies upon an affidavit of Victor C. Smith, Jr., a representative of Turner's during the negotiation of the prime contract. Mr. Smith states that it was his (and Turner's) understanding that the "ABC" clause was included merely to clarify that all normal communication in the project would be through Turner, and that the disputes procedures contained in SF–23A would be the route followed by the subcontractors (called the "separate contractors" in the affidavit) in presenting a claim.[14]

■■■ After reviewing these various affidavits, we conclude that the Disputes clause was not included in the subcontract in order to provide a claims procedure for subcontractors. Also, the existence of such a procedure for direct appeals by subcontractors would be in direct conflict with the inclusion of the "ABC" provision, a provision specially drafted for the prime and subcontracts. *See Ball State University,* 488 F.2d at 1016, 203 Ct.Cl. at 294. Furthermore, an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible. *See Hol-Gar Manufacturing Corp. v. United States,* 351 F.2d 972, 979, 169 Ct.Cl. 384, 391 (1965), and cases cited. The government's interpretation regarding the inclusion of the Disputes clause in the subcontracts is the only one that reconciles the use of this clause and the "ABC" clause.[15]

---

**14.** The government asserts that this affidavit is not part of the record of either this case or the *Bristol* case, and thus constitutes "an improper attempt to introduce new evidence into an appellate proceeding." Our conclusion that the Disputes clause was not included in the subcontracts to provide for direct appeals by subcontractors does not depend on this affidavit.

**15.** The ASBCA in *Bristol* relied upon the inclusion of the Disputes clause in the subcontract for its conclusion that privity existed, stating that the government "decides disputes under the terms of both the prime contract and the subcontract, with the contracting officer defined as the person executing 'this contract,' *i.e.,* both the prime contract and subcontract, on behalf of the Government." 81–1 BCA at 74,533. The board, however, did not resolve the issue of the intent of the parties with regard to the inclusion of the Disputes clause in the subcontract. After noting the conflicting affidavits submitted by the parties, the board stated:

> "Assuming, without deciding, the admissibility of evidence of the circumstances surrounding the inclusion of the quoted language concerning contractual relationships, it is unnecessary to make subsidiary findings to resolve these contentions. The affidavits are concerned with the alleged intentions of representatives of the Government and Turner, not of the Government and the subcontractors." [*Id.* at 74,531.]

We do not agree with the board's assumption that the intentions of the government representatives and Turner are an irrelevant consideration, as Turner could not have bound the government without the latter's consent. Also, the inclusion of both the Disputes clause and

Johnson also relies upon the following provision in the "Construction Management Special General Provisions" of the prime contract.

20. CLAIMS.

Whenever any claim arises under or out of any contract awarded in furtherance of this project, the Construction Manager shall diligently render all assistance which the Government may require, including the furnishing of reports with supporting information necessary to resolve the dispute or defend against the claim, participation in meetings or negotiations with the claimant or its representatives, appearance before the Board of Contract Appeals or court of law, and other assistance as may be appropriate; Provided, however, that the Construction Manager shall not be obligated under this contract to provide such services after all construction work has been completed and accepted by the Government.

■ Johnson asserts that the above provision clearly contemplates that the subcontractors have the right to proceed directly against the government. We hold that it does not provide for such authorization because, by its terms, it does not expressly authorize a direct subcontractor appeal. Admittedly, the implications of this provision would have produced a strange result if the board chose to process Johnson's claim as one sponsored by Turner.[16] In such a situation, Turner would have to prosecute the claim (at least nominally) and at the same time provide assistance to the government in defending the claim. However bizarre the operation of this provision seems, we do not find that it authorizes a

direct subcontractor appeal on the basis of mere implication.

■ In summary, we conclude that direct subcontractor appeals are not authorized by the terms of the contract documents. Although this theory of jurisdiction was apparently presented to the board, the ASBCA did not rely upon contractual consent as a basis for its finding of privity. However confusing the various contract provisions are (in both the prime and subcontracts), we do not think it likely or reasonable that the parties contemplated direct subcontractor appeals in the absence of an explicit statement authorizing such a procedure.[17] This is particularly true in light of the fact that direct subcontractor appeals have only been permitted in rare, exceptional cases; it is therefore unlikely that the parties would agree to such an unusual procedure by using such ambiguous language. As a consequence of this conclusion, we offer no opinion on whether the board could have properly asserted jurisdiction over a direct subcontractor appeal where the contract documents clearly authorize such a procedure.

### The Certification Issue

Johnson and the amici curiae (representing Turner, the prime contractor; Industrotech Constructors, Inc., Watson Electrical Construction Company and Crawford Sprinkler Company, bid package subcontractors with claims before the ASBCA) assert that the board correctly assumed jurisdiction under the CDA because Johnson was the proper party to provide certification of the claim, as required by 41 U.S.C. § 605(c)(1). The certification requirement has been held to be a jurisdictional prerequisite to the board's consideration of a claim under the

the "ABC" clause creates an issue of interpretation of the subcontract. In such a situation the understanding reached by the parties who drafted the contract is a relevant consideration. *Hollerbach v. United States,* 233 U.S. 165, 171–72, 34 S.Ct. 553, 555, 58 L.Ed. 898 (1914).

16. The government expressly concedes that the board could have processed Johnson's claim if it had been sponsored by Turner.

17. For example, the Department of Energy (DOE) has regulations that authorize direct subcontractor appeals. *See* 10 C.F.R. § 703.-102(b) (1982). The former Atomic Energy Commission (whose functions were incorporated into the DOE) has long made provision for direct subcontractor appeals. *See* Minsch, *Subcontracting in the Atomic Energy Program,* 16 Fed.B.J. 190 (1956). In contrast, the Department of Defense prohibits direct subcontractor appeals. *See* DAR 23–203(a) (1982).

CDA. *W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1338 (Fed.Cir.1983); *see also Skelly & Loy v. United States,* 685 F.2d 414, 418 (Ct.Cl.1982). Apparently the government urged that the ASBCA dismiss Johnson's claim because Turner's certification, not Johnson's, was a necessary prerequisite to the board's jurisdiction.

█ The certification issue would only present itself if we concluded that Johnson was a "contractor" under the CDA. The ASBCA in *Bristol* concluded that there was privity of contract between the subcontractor and the government, and that "the subcontractor not only may, but must, certify its claim under the Contract Disputes Act." 81–1 BCA at 74,533. Since we hold that there was no privity between Johnson and the government, we do not reach the certification issue. 41 U.S.C. § 605(c)(1) states that *"the contractor* shall certify ... the claim" (emphasis added). It logically follows that a determination of the proper party for certification must be preceded by a finding that the claimant is a "contractor" under the CDA.

█ Alternatively, Johnson argues that the board properly assumed jurisdiction because Turner submitted its own certification of the claim. The ASBCA did not rely on Turner's certification, however, as it treated Johnson's claim as a direct subcontractor appeal, rather than as a claim sponsored by Turner. Since the board did not rely on Turner's certification and did not consider Johnson's claim as being sponsored by Turner, we cannot rule on the adequacy of Turner's certification on the basis of a hypothetical situation.

### Conclusion

█ In conclusion, we hold that the ASBCA erred in assuming jurisdiction over a direct appeal by the subcontractor, as Johnson was not a "contractor" as that term is defined in the CDA. Our conclusion is based upon our holding that not only was there no privity of contract between the government and Johnson arising either from the contract language or from the doctrine of agency, but that no direct appeal by Johnson was authorized under either the prime contract or subcontract.

█ A general consideration also influencing our opinion is the doctrine that waivers of sovereign immunity are to be strictly construed. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). Prior to the enactment of the CDA, there were recommendations before Congress urging statutory authorization for direct subcontractor appeals. Congress chose not to adopt these recommendations.[18] While we do not accept the government's argument that the CDA was designed to eliminate all the previously recognized exceptions to the general rule that direct subcontractor appeals must fail for want of privity, there is no indication that Congress intended to broaden the scope of these exceptions. In order for us to find privity in this case, we would have to go further than any court has gone before. Congress has indicated its desire to retain the present sponsorship approach to subcontractor appeals, and Johnson does not state a claim under any of the recognized exceptions for direct subcontract appeals.

Accordingly, after consideration of the parties' and the amici curiae's submissions, and oral argument, we sustain the appeal of the government and reverse the decision of the ASBCA which held that it had jurisdiction of a direct appeal by this subcontractor.

REVERSED and VACATED.

---

**18.** *See* S.Rep. No. 1118, *supra.* *See also* 4 Report of the Commission on Government Pro-     curement 30–31 (1972).