UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF D'AMBRA CONSTRUCTION COMPANY, INC., Plaintiff,

v.

ST. PAUL MERCURY INSURANCE COMPANY, a Minnesota corporation, and North American Construction Corporation, a Texas corporation, Defendants.

No. CIV. A. 94–0215L.

United States District Court,
D. Rhode Island.

Oct. 29, 1998.

William J. Conley, Jr., East Providence, RI, for Plaintiff.

Gordon P. Cleary, Vetter & White, Providence, RI, Alan J. Sobol, Julia B. Morris, O'Connell, Flaherty & Attmore, Hartford, CT, for Defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

Use plaintiff ("D'Ambra"), a subcontractor on a federal government construction project, seeks compensation for services performed from the project's general contractor ("North American") and the general contractor's surety ("St. Paul"). This matter is before the Court on a motion by defendants' styled "Motion for Summary Judgment." Defendants seek a ruling as a matter of law that they are not liable beyond a certain amount. For this reason, the Court will treat the motion as one for partial summary judgment and grant it as indicated below.

## BACKGROUND

For the purposes of this motion, the complicated facts of this dispute may be briefly stated. In 1991, the United States Navy awarded defendant North American the contract to construct two new buildings at the Navy's Advanced Weapons Research Facility in Newport, Rhode Island. North American obtained a labor and material payment bond, as well as a performance bond, from defendant St. Paul to satisfy the requirements of the Miller Act. See 40 U.S.C. §§ 270a–270f (1994) (requiring the posting of a performance and payment bond by contractors awarded a federal government construction contract).

D'Ambra entered into a written agreement (the "Subcontract") with North American on December 24, 1991 to be a subcontractor on this Navy project. Under this contract, D'Ambra agreed to provide labor, materials, and equipment for the site and utility work. The Subcontract called for a flat payment of $426,000 for these services. Over the course of several years, D'Ambra completed significant portions of its assigned task. In addition to carrying out the specifics of the original plan for the project, D'Ambra also worked on alterations of and additions to the original plans.

Before the project was completed, however, the Navy informed North American in February 1994 that it was terminating their contract through the agreement's Termination for Convenience provision, an escape hatch common to federal government construction contracts. Shortly thereafter, North American informed D'Ambra that it was terminating the Subcontract.

North American sponsored a class on March 10, 1994 to explain the administrative procedures involved in making claims for payment following a Termination for Convenience. The class was intended for subcontractors who had worked on the project. D'Ambra was represented at the class by a company official and an attorney. On April 22, 1994, D'Ambra filed this action against North American and St. Paul, asserting jurisdiction under the Miller Act. See 40 U.S.C. § 270b(b) (vesting jurisdiction in the United States district courts for actions brought by persons who furnish labor and materials on federal construction projects and who seek to collect on a payment bond for services performed). In the Complaint, D'Ambra seeks compensation for work performed on the project for which it has not yet been paid by North American. D'Ambra also requests an award of monetary relief for damages it alleges were incurred as a result of delays in the construction project outside of its control.

D'Ambra was not content to rely on its federal lawsuit for relief, however. It choose also to pursue its cause through the settlement process outlined in the Contract Disputes Act. *See* 41 U.S.C. §§ 601–613 (1994) (outlining the system of claims resolution under the Contract Disputes Act). Under this system, imposed upon contractors in their contracts with the federal government, contractors on federal government construction projects that have been terminated are required to submit certified claims to the government for payment. *See* 41 U.S.C. § 605(c)(1). Only general contractors typically may submit claims because only they are in privity of contract with the government. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1557 (Fed.Cir. 1983). Subcontractors must submit claims to the general contractor who batches together all claims related to the project for which it is responsible and submits them to a government contract officer for review. *See Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1009 (Fed.Cir.1994) (describing this "sponsorship" system). This was the procedure followed in this case.

On January 30, 1995, D'Ambra submitted to North American a claim asserting that North American was liable to plaintiff for an outstanding balance on the construction project of $608,917.55. This balance due was based on total expenses incurred by D'Ambra of $1,212,087.16. North American responded with a request that D'Ambra submit a new certification of its claim in the form provided by North American. That form language required D'Ambra to assert that the United States government was liable for the full amount of the claim. The revised claim alleged that it "accurately reflects the contract adjustment for which the contractor believes the government is liable." D'Ambra complied by submitting the revised claim to North American on February 21, 1995.

North American submitted D'Ambra's claim, along with its own claims and those of other subcontractors, to the federal government according to the procedures of the Contract Disputes Act. The Defense Contract Audit Agency audited D'Ambra's certified claim and determined that it could not compensate D'Ambra for much of its alleged costs. Based on this audit, the Navy's Contracting Officer responsible for the settlement negotiations between North American and the federal government determined that D'Ambra was entitled only to an additional $32,549.30 beyond what it had already been paid, and that D'Ambra was not entitled to the full $608,917.55 claimed.

Following further research by North American into all of the claims arising from the project, it resubmitted the claims to the Contracting Officer in October 1996. North American claimed $492,958 on D'Ambra's behalf. Shortly thereafter, North American began global settlement negotiations with the federal government. The settlement was completed on December 23, 1996. As part of this agreement, the Contracting Officer increased the amount to which it determined that D'Ambra was entitled to $87,161. Unsatisfied with that sum, D'Ambra has pursued this federal lawsuit.

In the Complaint, D'Ambra alleges simply that it performed over $1.2 million of work on the Navy project under a contract with North American and that it has only been paid approximately one-half of that amount. It holds North American responsible for the balance and relies on the Miller Act for authority to proceed against the bond issued by St. Paul to satisfy the shortfall in payments. Defendants deny responsibility for the full amount sought by D'Ambra. They insist that D'Ambra is estopped from seeking relief from defendants because it previously submitted to North American a certified claim asserting that the federal government was liable for its damages.

## DISCUSSION

### I. Standard of Review

Although defendants' motion seeks summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure, it is more properly considered under Rule 56(d) as a motion for partial summary judgment. The circumstances of this case are unique. Defendants are not entitled to full vindication. They are liable to plaintiff for a portion of the amount sought as a matter of law. Yet,

to achieve this result, this Court will grant defendants' motion for partial summary judgment. Rule 56(d) provides a mechanism whereby a court may fashion such relief.

Partial summary judgment under Rule 56(d) is separate and distinct from a motion for summary judgment under Rule 56(c), although the two are often improperly interchanged. Rule 56(d) arms the court with a tool to "narrow the factual issues for trial." *Rivera–Flores v. Puerto Rico Tel. Co.,* 64 F.3d 742, 747 (1st Cir.1995). The rule provides that when "judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary," the court may "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." Fed.R.Civ.P. 56(d). Based upon such an inquiry, the court may then devise an appropriate order "including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just." *Id.*

The standard for ruling on a Rule 56(d) motion is "identical to that deployed when considering a summary judgment motion under Rule 56(c)." *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Educ.,* 915 F.Supp. 1267, 1279 (D.R.I.1996) (citing *Flanders & Medeiros Inc. v. Bogosian,* 868 F.Supp. 412, 417 (D.R.I.1994), *aff'd in part, rev'd in part,* 65 F.3d 198 (1st Cir. 1995)). Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991).

However, a grant of summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). Summary judgement is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir. 1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. Analysis

Although this dispute takes place in the context of the complex administrative system of federal government construction contracts, its resolution lies in the application of contract law fundamentals. The interpretation of contract language is a matter of law to be decided by the court. *See Newport Plaza Assocs. v. Durfee Attleboro Bank,* 985 F.2d 640, 644–45 (1st Cir.1993). Partial summary judgment is appropriate in this case because this Court need do no more than apply the undisputed facts to the language of the contract between the parties. For that reason, this Court need not reach defendants' estoppel arguments.

This Court has explained that when a contract is clear and unambiguous on its face, the Court will enforce the contract as written. *See Kelly v. Tillotson–Pearson, Inc.,* 840 F.Supp. 935, 944 (D.R.I.1994) (citing *Aetna Cas. & Sur. Co. v. Graziano,* 587 A.2d 916, 917 (R.I.1991)). When the language of the Subcontract itself is carefully examined, much of D'Ambra's claim is revealed to be without merit because the agreement be-

tween the parties limits its relief to the process that it has already received.

Analysis of the Subcontract's impact on this dispute begins, logically, in Clause 8, entitled "Settlement of Controversies." Under this provision, D'Ambra agreed that the parties to the project, D'Ambra, North American and the federal government, would attempt to reach a mutually satisfactory settlement of "any controversy" arising from the project. This provision covered the universe of possible disagreements between the parties including those concerning the

> quantity, kind, price or value of any materials or supplies furnished or to be furnished by the SUBCONTRACTOR, ... or in respect to any kind of labor or manner of performance thereof, or in respect to any other matter or thing pertaining to or connected with the work provided for herein.

This clause also delineated the limits of North American's liability to D'Ambra:

> The tender to the SUBCONTRACTOR of the amount due or to become due to him under and according to said settlement shall operate to release the CONTRACTOR and the PRINCIPAL ... and the surety of the CONTRACTOR from liability to the SUBCONTRACTOR for any sum of money or damages in excess of the amount tendered. The said amount to be tendered shall in no case be greater than the amount allowed and paid by the PRINCIPAL [the United States government].

The clear import of this language is that the federal government is to serve as the final arbiter of subcontractor claims. Under the Subcontract, North American is liable to a subcontractor only to the extent of payments made by the federal government to North American for the purpose of reimbursing subcontractor work. In this case, the Contracting Officer eventually determined that D'Ambra was entitled to an additional $87,-161. Under Clause 8, D'Ambra's claims against North American and St. Paul are extinguished when that amount is tendered to D'Ambra.

This interpretation of the role of the federal government in resolving disputes between D'Ambra and North American is buttressed by other provisions of the Subcontract. The procedures to govern the settlement of the Subcontract in the event of a Termination for Convenience are provided for in Clause 30, entitled "Additional Grounds for Termination." Under this provision, North American may terminate the Subcontract at any time "when it is determined, at CONTRACTOR'S sole discretion, to be in CONTRACTOR'S best interest." Upon termination, this clause provides that the parties are to negotiate a settlement. Further, the parties are bound to apply to the settlement process the rules contained in Clause 17, entitled "Partial Payment."

The federal government has a controlling role in settling disputes under the "Partial Payment" clause. This section provides:

> The estimates and calculations made by the PRINCIPAL as to the amount of work completed by the SUBCONTRACTOR hereunder shall be final and binding upon the parties hereto and shall conclusively establish the amount of work done by the SUBCONTRACTOR hereunder.

These provisions of the Subcontract create a process for the resolution of disputes between D'Ambra ·and North American. The procedure calls for de facto determination by the federal government of the amount to which the subcontractor is entitled because North American is liable to a subcontractor only to the extent that the government approves of the subcontractor's claims, submitted as "pass-through" claims by the general contractor. North American has no duty to pass on to D'Ambra any amount beyond that paid by the federal government. D'Ambra agreed to be bound by this arrangement. Furthermore, this process is common to subcontractor contracts in government construction projects. *See George Hyman Constr. Co. v. United States,* 30 Fed. Cl. 170, 175–76 (1993) (listing cases in which the parties operated under a contract imposing conditional liability on the general contractor), *aff'd,* 39 F.3d 1197 (Fed.Cir.1994). This Court will hold D'Ambra to its bargain. It is irrelevant that D'Ambra alleges that it was misled by North American to submit a certified claim pinning liability on the federal government.

 

Regardless of the language of the certified claim made by D'Ambra, North American's liability is limited to the amount paid by the government on D'Ambra's claim.

Furthermore, a significant portion of the damages sought by D'Ambra is attributed to a class of expense that is expressly disallowed by the Subcontract. Although the Complaint fails to explain exactly what portion of the $608,917.55 is a result of "delay damages," D'Ambra's memoranda indicate that several hundred thousand dollars of the claim is attributable to these damages. However, several provisions of the Subcontract expressly absolve North American of all liability for "delay damages." In Clause 13(C.), the Subcontract states that in the event D'Ambra is required to perform extra work that was not contemplated by the original plans for the project, North American will be liable for direct expenses of that work only, "[a]nd in no case will indirect expenses such as unabsorbed overhead, delay damages, loss of business and etc. be allowed." The same language is repeated in Clause 30(B.) in the context of Termination for Convenience payments.

D'Ambra does not dispute that the federal government's Contracting Officer determined that it was only entitled to an additional $87,161, nor does it dispute that the Subcontract is an agreement that is enforceable by this Court. Those facts alone compel the result this Court must reach. D'Ambra's alleged inexperience in government construction projects that have been terminated for convenience is immaterial. What is material is that D'Ambra agreed to a contract that established both a procedure for the resolution of disputes and a limitation on the liability of the general contractor. Plaintiff is entitled to no more than the sum paid to North American by the federal government for D'Ambra's work on the project.

## CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is granted. Defendants are not liable for more than the federal government has allowed on D'Ambra's claim. A hearing will be scheduled to determine the precise amount of the judgment to be entered for D'Ambra against defendants.

It is so ordered.