ECOLOGY AND ENVIRONMENT, INC., on its own behalf and on behalf of and for the use and benefit of Howard Robson, Inc., Plaintiff,

v.

UNITED STATES, Defendant.

No. 97–1082C.

United States Court of Federal Claims.

April 21, 1999.

Mark F. Brancato, Fuller Company, Bethlehem, PA, attorney of record, for plaintiff.

Caroline A.E. Smith and Paul S. Padda, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C., with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, attorneys of record, for the defendant. Denise Harris, Assistant Regional Counsel, Environmental Protection Agency, Philadelphia, PA, of counsel.

## OPINION

HORN, Judge.

This case comes before the court on the defendant's motion for summary judgment and the plaintiff's cross-motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The defendant, acting through the Environmental Protection Agency (EPA), awarded a cost-reimbursement contract for the construction of a groundwater treatment system to the plaintiff, Ecology & Environment, Inc. Ecology & Environment then awarded a subcontract to Howard Robson, Inc. (HRI) to perform the actual construction of the groundwater treatment system. The parties have stipulated that, in awarding the subcontract to HRI, Ecology & Environment was not acting as an agent of the defendant. During the construction of the groundwater treatment system, HRI submitted applications for payment to Ecology & Environment for work that was performed by HRI in constructing the groundwater treatment system. The parties also have stipulated that Ecology & Environment made adjustments to HRI's applications for payment and deleted amounts that Ecology & Environment determined "were not payable at that time or otherwise were not payable at all under the terms of the Subcontract" before submitting the applications to the EPA. In the instant action, the plaintiff filed a complaint in this court "seeking recovery of $108,665.93 for Alternate A.1 and $29,730.14 for Alternate A.4 of the Subcontract between itself and HRI. Additionally, E & E's [Ecology & Environment's] claim seeks interest, and E & E's fees on the amount awarded."

The defendant filed a motion for summary judgment stating that the government is entitled to summary judgment because the defendant has compensated fully the plaintiff for all of the payment applications that Ecology & Environment submitted for payment to the government. Defendant also argues that summary judgment is appropriate because the case at bar is an "intramural dispute" between Ecology & Environment and HRI.

Plaintiff argues in its cross-motion for partial summary judgment that because HRI "is entitled to payment for the work, purportedly covered by Change Order [No.] 22 as a deductive change to Alternate A.1 under Article 12.3.F.2.d & e, plaintiff is liable to Howard Robson for the unpaid portion of the net lump sum price for Alternate A.1," and judgment should be awarded in its favor. In addition, the plaintiff, as the prime contractor, suing on behalf of the subcontractor, claims that summary judgment is appropriate because a change order to the contract incorporated a revised site plan that allegedly doubled the amount of feet of pipe required from that amount estimated on the bid form, and added three bends that were

not included on the bid form. In addition, the plaintiff argues that it is owed for three bends in the pipe and a unit price for the diameter pipe which it actually installed, because Ecology & Environment, prior to submitting the invoice to the government, allegedly deleted payment charges covering the cost of the three bends and substituted a unit price for a smaller diameter pipe from HRI's application for payment submitted to Ecology & Environment.

## FACTS

Plaintiff, Ecology & Environment, is a New York corporation having its principal place of business in Lancaster, New York. Ecology & Environment filed this suit "on its own behalf and on behalf of and for the use and benefit of Howard Robson, Inc.," which is a Pennsylvania corporation, having its principal place of business in Landisville, Pennsylvania.

The defendant, acting by and through the EPA, has the authority to remove, or arrange for the removal of, and to provide remedial action relating to hazardous substances, pollutants, or contaminants on a site under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), as amended and codified at 42 U.S.C. §§ 9601–9675 (1994). On May 6, 1988, plaintiff Ecology & Environment entered into a cost-reimbursement contract, Contract No. 68–W8–0085, with the EPA that was the prime contract in the instant action. Under the prime contract, plaintiff was to provide remedial planning, design, and implementation at future selected hazardous waste disposal sites in support of the EPA's CERCLA related, remedial, response efforts. The prime contract contemplated work assignments to be issued under the contract, designating specific sites for remediation. Work assignment No. 85–03–3N64 was issued by the EPA on December 30, 1988. This work assignment ordered Ecology & Environment to initiate the design of a groundwater extraction, treatment, and reinjection system at a site known as the "Berks Sand Pit," located in Longswamp Township, Berks County, Pennsylvania.

In August 1991, the government issued Contract Modification No. 0057, which required Ecology & Environment to prepare a work plan and to take preliminary steps towards construction of the groundwater treatment plant. On January 8, 1992, the EPA issued Contract Modification No. 0071, approving Ecology & Environment's work plan for the construction of the treatment plant. Ecology & Environment initiated the requisite steps in order to hire a subcontractor to perform the actual construction project.

The terms of the prime contract between Ecology & Environment and EPA set out the requirements for the hiring of subcontractors, including the requirement to obtain the permission of the EPA prior to the hiring of a subcontractor by Ecology & Environment. Incorporated into the contract was 48 C.F.R. § 52.244–2 (1988) entitled "SUBCONTRACTS (COST–REIMBURSEMENT AND LETTER CONTRACTS) (JUL 1985)" that required the submission of a justification package for subcontractor approval:

(a) "Subcontract," as used in this clause, includes but is not limited to purchase orders, and changes and modifications to purchase orders. The Contractor shall notify the Contracting Officer reasonably in advance of entering into any subcontract if—

(1) The proposed subcontract is of the cost-reimbursement, time-and-materials, or labor-hour type;

\* \* \*

(b) (1) In the case of a proposed subcontract that (i) is of the cost-reimbursement, time-and-materials, or labor-hour type and is estimated to exceed $10,000, including any fee, (ii) is proposed to exceed $100,000, or (iii) is one of a number of subcontracts with a single subcontractor, under this contract, for the same or related supplies or services that, in the aggregate, are expected to exceed $100,000, the advance notification required by paragraph (a) above shall include the information specified in subparagraph (2) below.

(2) (i) A description of the supplies or services to be subcontracted.

(ii) Identification of the type of subcontract to be used.

(iii) Identification of the proposed subcontractor and an explanation of why and how the proposed subcontractor was selected, including the competition obtained.

(iv) The proposed subcontract price and the Contractor's cost or price analysis.

(v) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions.

(vi) The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract.

(vii) A negotiation memorandum reflecting—

(A) The principal elements of the subcontract price negotiations;

(B) The most significant considerations controlling establishment of initial or revised prices;

(C) The reason cost or pricing data were or were not required;

(D) The extent, if any, to which the Contractor did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(E) The extent to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Contractor and the subcontractor; and the effect of any such defective data on the total price negotiated;

(F) The reasons for any significant difference between the Contractor's price objective and the price negotiated;

\* \* \*

(c) The Contractor shall obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is required under paragraph (a) above. However, the Contracting Officer may ratify in writing any such subcontract. Ratification shall constitute the consent of the Contracting Officer.

(d) If the Contractor has an approved purchasing system and the subcontract is within the scope of such approval, the Contractor may enter into the subcontracts described in subparagraphs (a)(1) and (a)(2) above without the consent of the Contracting Officer, unless this contract is for the acquisition of major systems, subsystems, or their components.

(e) Even if the Contractor's purchasing system has been approved, the Contractor shall obtain the Contracting Officer's written consent before placing subcontracts that have been selected for special surveillance and identified in the Schedule of this contract.

(f) Unless the consent or approval specifically provides otherwise, neither consent by the Contracting Officer to any subcontract nor approval of the Contractor's purchasing system shall constitute a determination (1) of the acceptability of any subcontract terms or conditions, (2) of the allowability of any cost under this contract, or (3) to relieve the Contractor of any responsibility for performing this contract.

(g) No subcontract placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis, and any fee payable under cost-reimbursement type subcontracts shall not exceed the fee limitations in paragraph 15.903(d) of the Federal Acquisition Regulation (FAR).

(h) The Contractor shall give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Contractor by any subcontractor or vendor that, in the opinion of the Contractor, may result in litigation related in any way to this contract, with respect to which the Contractor may be entitled to reimbursement from the Government.

(i) (1) The Contractor shall insert in each price redetermination or incentive price revision subcontract under this contract the substance of the paragraph "Quarterly limitation on payments statement" of the clause at 52.216–5, Price Re-

determination—Prospective, 52.216–6, Price Re determination—Retroactive, 52.216–16, Incentive Price Revision—Firm Target, or 52.216–17, Incentive Price Revision—Successive Targets, as appropriate, modified in accordance with the paragraph entitled "Subcontracts" of that clause.

(2) Additionally, the Contractor shall include in each cost-reimbursement subcontract under this contract a requirement that the subcontractor insert the substance of the appropriate modified subparagraph referred to in subparagraph

1) above in each lower tier price redetermination or incentive price revision subcontract under that subcontract.

48 C.F.R. § 52.244–2 (1988).

According to Ecology & Environment, the EPA assisted in preparing bidding documents for the hiring of a subcontractor and advertised them in the Commerce Business Daily on December 13, 1991. Thereafter, on January 22, 1992, the Invitation for Bid notice was advertised in the Commerce Business Daily. Of the twelve bids submitted, the bid submitted by HRI was the lowest. After reviewing the bid, the EPA consented to Ecology & Environment's recommendation regarding the issuance of a subcontract and to award the subcontract to HRI. On May 7, 1992, Ecology & Environment entered into the subcontract, Agreement No. ZEO3021–44, with HRI.

In the subcontract bid document issued by Ecology & Environment, a "Requirements" section listed "Alternates which will be exercised at the discretion of the [Ecology & Environment] Construction Manager after further technical information is obtained on the extent of groundwater contamination." Although the section of the subcontract bid document consisted of six alternates, the provisions of the section at issue in the above-captioned case are Alternates A.1 and A.4. Alternate A.1, the subject of Count I of Ecology & Environment's complaint, required "installation of a second groundwater treatment system." Alternate A.4, the subject of Count II of plaintiff's complaint, required "installation of various diameter piping in the field."

By March of 1993, HRI had substantially completed the base bid contract work (*i.e.*, the first groundwater treatment system). HRI scheduled, managed and performed all work on the construction of the base bid contract work, using its own forces and those of a subcontractor hired by HRI. During the construction, Ecology & Environment inspected HRI's work, submitted inspection reports to the EPA and continued to perform remedial planning at the project site to determine whether work covered by the Alternates would be required.

On March 18, 1993, Ecology & Environment, with EPA approval, informed HRI in writing that it intended to implement Alternates A.1 through A.5 "with modifications." The letter indicated that a complete second treatment system would not be constructed, but a portion of Alternate A.1 would be required. On April 2, 1993, Ecology & Environment forwarded a letter to HRI indicating the modification to Alternate A.1. At that time, Ecology & Environment also included an updated Scope of Work, which modified the contract documents and requested HRI to revise its costs and submit them to Ecology & Environment by April 15, 1993. The impact of the revised Scope of Work issued for the subcontract modified Alternate A.1 by changing the groundwater system from a "treatment" to a "recovery" system, and by deleting subparagraph 1.4.C of Specifications Section 01030 of the construction subcontract and replacing it with the following:

The second groundwater recovery system shall include a main header pipe from the second header box to the existing unused main header pipe, and connecting pipe from the existing unused main header pipe to the existing equalization tank. The system shall also include control and instrumentation equipment. The system is to be constructed as shown on the related Drawings attached to the Contract Documents, except as modified in all Addenda, approved submittals, and change orders approved during the construction under the base bid contract. The control and instrumentation equipment shall include a new motor control center sized to hold the motor starters for the pumps in the second

series of extraction wells, and a new control panel, both located in the existing control room. The new control panel shall include (3) flow controllers (one for each well), a(6) pen recorder (for level in each of the second series of extraction wells, and flow rate from each of the second series of extraction wells to the new header box), and pilot lights for the well pumps. The alarms/interlocks and pilot lights for the second series of extraction wells shall function the same as those for the existing groundwater treatment system, and shall utilize the annunciator in the existing control panel. Note that the [ ] full alternate treatment system shown in the related Drawings attached to the Contract Documents shall not be implemented.

The changes outlined in the revised Scope of Work, forwarded to HRI on April 2, 1993, were consistent with Ecology & Environment's and EPA's intent that the treatment aspects of the second groundwater treatment system were to be deleted and that the recovery aspects of the system were to be retained.

As requested, on April 14, 1993, HRI provided Ecology & Environment with its revised pricing for the Alternates A.1 through A.6, showing a revised price of $247,500.00 for alternate A.1 and revised pricing for Alternate A.4 showing composite unit prices for double wall piping. On April 22, 1993, Ecology & Environment wrote to HRI in response to its revised price schedule of April 14, 1993, and requested that HRI provide the line item price from its contract bid form and then list the revised price from Alternate A.1. Ecology & Environment further requested a breakdown of the revised total costs by material, equipment, labor, overhead, profit and taxes. For Alternate A.4, Ecology & Environment requested that HRI provide the line item price from its contract bid form. On April 28, 1993, HRI responded in part and submitted a modified Revised Alternate Price Schedule. HRI's cover letter to the April 28, 1993 modified price schedule stated in relevant part:

Please note that we have taken exception to your request in *Item 1* to furnish by a breakdown of the revised total. In lieu of

your request, we have furnished summaries of the additions and deductions to the work as modified by your correspondence of April 2, 1993 and previous changes incorporated into the base bid. We believe this is more in line with the requirements of Specification Section 00700 for changes to lump sum and unit price work.

The Revised Alternate Price Schedule submitted by HRI showed a new price of $241,-945.00 for Alternate A.1 and "composite unit prices for double wall piping and 3 bends added by the change order at $611.38 each" for Alternate A.4.

Ecology & Environment relayed HRI's Revised Alternate Price Schedule to EPA. According to the joint stipulations, "E & E believed and recommended to the EPA that the net amount proposed by HRI for Alternate A.1 should be lower. EPA agreed." Ecology & Environment then met with HRI in an attempt to arrive at an acceptable adjustment to the price for Alternate A.1. Ecology & Environment and HRI failed to reach an agreement for an adjustment to the price and an impasse developed. The complaint alleges that this failure to reach an agreement as to amount stemmed from HRI's insistence that the price must be adjusted as required by Specifications Section 00700, Article 12.J of the construction subcontract; specifically, the original price for Alternate A.1, minus the costs of the deleted work that HRI would have incurred (plus 10% of those costs) and the costs of the added work (plus 15% of those costs).

On May 21, 1993, Ecology & Environment submitted to HRI a Notice to Proceed with regard to the work covered by Alternates A.2 through A.5, as follows, in pertinent part:

This letter serves as Notice to Proceed (NTP) with the work associated with Alternates 2 through 5, as amended by Ecology and Environment's (E & E's) letter to you dated April 2, 1993 (Document No. LT–RAM–C246) for which you submitted a Revised Alternate Price Schedule (dated April 28, 1993; C–10000–068).

E & E is picking up Alternates 2 through 5, based on your Revised Alternate Price Schedule, however item A.4R differs from your original bid and involves no change in

the specified material. This change in price is unjustified.

Because of a substantially changed scope of work, Alternates 1 and 6 will not be picked up. Instead, we are including Change orders to the base bid. These change orders are summarized in the enclosure with further detail provided as necessary for clarification. Please provide your pricing (credit and/or debits) for these changes as soon as possible per Specifications Section 00700, Paragraph 12.3.C. Each of these Change Orders should be broken down by labor, material, equipment, overhead, profit, and bond as your previous change orders have been submitted.

In any event, such work shall commence immediately. . . .

Attached to Ecology & Environment's May 21, 1993 letter was Change Order No. 22. Change Order No. 22 was issued by Ecology & Environment, based on their recommendation to the EPA, and directed HRI to "[p]rovide and install the control and instrumentation system for the second groundwater recovery system per Attachment D."

At that time, before the May 21, 1993 Notice to Proceed and Change Order No. 22 were issued, the first groundwater treatment system was in operation. The change order impacted the installation of a second groundwater treatment system. The work described in Attachment D of the May 21, 1993 letter was not required to complete construction of the groundwater treatment system as bid, nor was it needed to permit that system to function or to be operated as bid. In addition, neither construction nor operation of the second groundwater treatment system as bid was required in order to complete construction of or operate the base bid groundwater treatment system as bid, nor was the second system necessary or required to allow the base bid groundwater treatment system to function as intended either at the time of bid or as of the date when it was placed into service. Also, the changes to Alternates A.1 through A.6 that were issued after March 1993, were not needed to make construction of the base bid work complete

as bid or to allow the first groundwater treatment system to function as bid.

Change Order No. 22 was issued based upon Ecology & Environment's recommendation to the EPA. HRI refused to recognize Change Order No. 22 as being a valid change order, contending that the work covered by Change Order No. 22 was nothing more than original subcontract work covered by Alternate A.1 and that payment for the work should be made as an adjustment to the subcontract lump price for Alternate A.1 under Specifications Section 00700, Article 12.3.C of the subcontract and not as a change to the base bid. Moreover, HRI contended that Ecology & Environment and the EPA improperly attempted to "delete" what remained in Alternate A.1 under the April 2, 1993 Change Order, reintroduce it as a "change" to the base bid portion of the subcontract, and pay for it as extra work at an amount substantially below what otherwise would be payable under the subcontract's Article 12.3.C.

Ecology & Environment and HRI met to discuss their impasse over Change Order No. 22 of the subcontract. HRI agreed to proceed with work on Alternates A.2 through A.5, but refused to proceed with work under Change Order No. 22 and insisted that the work must be viewed, and paid for, as a change to Alternate A.1. On June 3, 1993, Ecology & Environment informed the EPA of the impasse with HRI over Alternate A.1/ Change Order No. 22 and presented the following options for consideration pertaining to the subcontract: (1) termination for default, (2) termination for convenience, (3) have Ecology & Environment take over the work, or (4) mandate that HRI do the work "under force account." On June 8, 1993, Ecology & Environment gave HRI seven days notice to commence work under Change Order No. 22 and stated that, if HRI did not commence work, Ecology & Environment might seek to terminate the subcontract for default to protect the interests of Ecology & Environment and the EPA.

On June 15, 1993, HRI notified Ecology & Environment that it would proceed with the work, but with the express understanding that it did not recognize Change Order No.

22 as a valid change order, and that it would invoice Ecology & Environment for work on "Change Order No. 22" as work covered by and priced according to Alternate A.1. In its August 17, 1993 application for payment submitted to Ecology & Environment, HRI placed the payment request amount for the work undertaken pursuant to Change Order No. 22 on the line for payment under Alternate A.1.

On September 1, 1993, Ecology & Environment wrote HRI and stated:

> Howard Robson Incorporated (HRI) requested payment for Alternate A.1. As covered under previous correspondence, E & E has not authorized the performance of A.1. However, E & E has requested that HRI tie-in the second pumping system to the base treatment facility under Change Order (CO) 22. The price of that change has yet to be finalized.... E & E has authorized partial payment under CO 22 based on E & E's estimate of the value of the CO.

Ecology & Environment then adjusted the amounts in HRI's application before submitting it to the government for payment by striking the amounts that HRI placed next to Alternate A.1. Thus, Ecology & Environment placed a zero dollar sum next to Alternate A.1 and placed a lump sum price of $90,000.00 next to Change Order No. 22, a percentage completion of 90%, and an amount payable of $81,000.00. Ecology & Environment informed HRI of these adjustments. On September 7, 1993, HRI objected to the adjustments made by Ecology & Environment, reiterated its contention that it was entitled to be paid under Section 12.3.J pursuant to 12.3.C of the subcontract for Alternate A.1, and gave notice under Specifications Section 00700 of the subcontract of its intent to appeal Ecology & Environment's determination of the amounts to be paid for HRI's work on Alternates A.1.

The subsequent applications for payment submitted by HRI to Ecology & Environment were likewise changed prior to submission to the EPA, in that Ecology & Environment placed dollar amounts and percentages of completion under the Change Order No. 22 heading. Ecology & Environment ulti-mately requested payment of $105,340.00 from the EPA. EPA paid Ecology & Environment a total of $105,340.00 for what was designated as Change Order No. 22 and, in turn, those sums were paid by Ecology & Environment to HRI.

Thereafter, another dispute arose over the amount paid to HRI by Ecology & Environment pursuant to Alternate A.4 of the subcontract, which is encompassed in the instant action in Count II of plaintiff's complaint. This dispute arose because the revised site plan drawing for Alternate A.4 allegedly showed that the actual length of piping from the wells to the treatment facility had nearly doubled from what had been estimated in the bid form and shown on a construction drawing, Drawing ZE3000–A02. The revised site plan drawing also showed double wall piping consisting of 6″ containment pipe and 4″ carrier pipe. In addition, the revised site plan drawing showed the addition of bends in the piping to be supplied and installed by HRI under Alternate A.4. However, neither the bid form nor the specifications for Alternate A.4 indicated that bends would be required.

In its August 17, 1993 application for payment for Alternate A.4, HRI used the composite unit prices for double wall pipe and the three 45–degree bends that it listed in its April 28, 1993 Revised Alternate Pricing Schedule. Ecology & Environment significantly lowered those unit prices, after informing HRI, and submitted them as altered to the EPA. On September 7, 1993, in a letter to Ecology & Environment, HRI objected to the adjustments to its application for payment for Alternate A.4 and gave notice under Specifications Section 00700, Article 9.3.C, of its intent to appeal Ecology & Environment's determination of amount of payment.

On February 24, 1994, HRI sent a certified claim directly to the EPA's contracting officer for $214,005.93 for work performed under Alternate A.1 as modified, less the payments that it had received from Ecology & Environment under Change Order No. 22, and for $29,730.14 for Alternate A.4. The contracting officer wrote to counsel for HRI on June 28, 1994 and stated that HRI did not have standing under the Contract Disputes Act

(CDA) to directly assert a claim against the EPA and thus declined to address the merits of the claim.

Ecology & Environment also filed a claim with the contracting officer "on HRI's behalf" on March 28, 1994. Ecology & Environment stated in the claim that HRI was entitled to $214,005.93 for Alternate A.1. Ecology & Environment stated that "E & E has valued this work under its Change Order [No.] 22 in the amount of $105,340, of which $81,000 has been paid to date" and that it " 'appears' that HRI's claim for Alternate A–1 was $133,005.93."[1] Ecology & Environment also asserted a claim on behalf of HRI for Alternate A.4 in the amount of $29,730.14. Ecology & Environment concluded its claim on behalf of HRI by stating:

> Thus, the maximum amount of HRI's claim, is $162,736.07. E & E requests payment of such portion of this amount as EPA determines to be owing from E & E to HRI under the Subcontract Documents, and requests that this claim be paid by EPA to E & E in an identical amount under the cost reimbursement principles of E & E's ARCS Contract with the EPA and the provisions of FAR Paragraph 52.216–7 incorporated therein, together with an additional five percent as E & E's base and award fee for subcontract administration (two percent base fee and three percent award fee).

On June 29, 1994, the contracting officer sent a letter to counsel for Ecology & Environment which stated that she declined to decide the merits of the claims because "the alleged claim does not meet the certification requirements set forth in the Federal Acquisition Regulations (FAR) Part 33.207." The contracting officer found that "[t]he narrative, accompanying the certification signed by

Mr. Robert Marszalkowski, does not support the certification as it fails to clearly specify the amount that E & E believes the government is liable."

Subsequently, Ecology & Environment filed a complaint in this court seeking recovery of $108,665.93 for Alternate A.1 and $29,-730.14 for Alternate A.4 of the subcontract between Ecology & Environment and HRI. Ecology & Environment also seeks interest and fees on the amounts awarded from this court. The defendant responded to the plaintiff's complaint with a motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). The defendant alleged that the court should dismiss the plaintiff's complaint since Ecology & Environment failed to comply with the CDA "because E & E failed to request payment of a sum certain." The government also rejected Ecology & Environment's claim "because the relief requested did not relate to or arise under the contract between E & E and the EPA" and the claimant did not demonstrate "privity of contract between the subcontractor, HRI, and the EPA." Given the record available to the court at the time, the court denied the defendant's motion to dismiss in an order based upon discussions and argument by the parties in court.[2]

Thereafter, the defendant filed a motion for summary judgment and the plaintiff filed a response to the defendant's motion for summary judgment, as well as a cross-motion for partial summary judgment. The defendant filed a reply to the plaintiff's cross-motion for partial summary judgment and response to the defendant's motion for summary judgment. The parties have filed a comprehensive joint stipulations of fact in

---

1. The parties have stipulated that the balance of the $105,340.00 that was requested and recommended by Ecology & Environment was paid by EPA to the plaintiff's public vouchers and, in turn, by Ecology & Environment to HRI, thereby reducing the net amount of the claim for Alternate A.1 to $108,665.93 and the total of the claims for Alternates A.1 and A.4 to $138,396.07.

2. At times relationships and discovery in the above-captioned case have been difficult, contentious, and time consuming. For example, during

discovery, plaintiff submitted a number of motions to compel. The plaintiff also filed a motion for sanctions against counsel for the defendant. The plaintiff stated that "Defendant knew or should have known at the time when it made its motion [to dismiss] under Rule 12(b)(4) that the motion was completely groundless as a matter of fact and law." Ultimately, the motion to dismiss was denied, although it was not found to be frivolous. The plaintiff subsequently withdrew the motion for sanctions.

conjunction with their motions for summary judgment and oral argument was conducted.

## DISCUSSION

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar both in language and effect.[3] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d

---

**3.** In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y*

*DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241,

245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the above-captioned case, the parties agree that summary judgment is appropriate and have filed joint stipulations of fact. Moreover, no issues have been identified by the parties or the court which raise material issues of disputed fact.

The defendant emphasized at oral argument, and summarized in its motion for summary judgment, the facts that the government believed were relevant to address the merits of the case:

The salient, undisputed facts in this case, as stipulated to by the parties, are as follows: (1) The EPA awarded E & E a cost-reimbursement contract for the construction of a groundwater treatment system; (2) In turn, E & E awarded a subcontract to HRI to perform the *actual* construction of the groundwater treatment system; (3) The EPA was not a party to the subcontract between E & E and HRI; (4) The EPA did not draft the subcontract document; (5) E & E was not acting as an agent of the EPA; (6) During the construction of the groundwater treatment system, HRI would submit applications for payment to E & E for work performed by HRI in constructing the groundwater treatment system; (7) E & E reviewed these applications for payment and, in a number of instances, made adjustments to the quantities or the amounts that HRI requested; (8) E & E determined that the deleted amounts either were not payable at that time or were not payable at all under the terms of its subcontract with HRI; (9) E & E submitted monthly progress reports to the EPA's Region III office in Philadelphia, Pennsylvania covering the work performed during the reporting period and stating the costs and hours that were determined, *in E & E's estimation,* to be payable by the EPA; (10) Accompanying these monthly reports submitted by

E & E were vouchers requesting payment from the EPA; (11) Attached to the vouchers were documents detailing the breakdown and computation of the amount stated on the voucher, including HRI's application for payment as adjusted (if at all) by E & E, E & E's invoice, and a *determination from E & E on the amount of HRI's application for payment that should be paid by the EPA;* (12) Provided that EPA did not object to any portion of the costs or fees submitted by E & E for payment, EPA processed E & E's voucher for payment and issued payments to E & E, including those covering work performed by HRI; and (13) To date, *EPA has paid in full every voucher ever submitted by E & E* that included applications for payment submitted by HRI to E & E for the construction of the groundwater treatment system.

(citations omitted) (emphasis in original).

Based on these facts, the defendant contends that "this litigation is merely a dispute concerning HRI's dissatisfaction with the amount of money requested by E & E upon HRI's behalf from the Government." The government also states that, while the plaintiff argues that Ecology & Environment acted on the EPA's behalf and represented the government's interests in all dealings with HRI, this fact is of little consequence because it is undisputed in the joint stipulations that Ecology & Environment did not act as the EPA's agent, and, therefore, Ecology & Environment's actions cannot be imputed to the EPA.

The defendant further argues that Ecology & Environment's determinations regarding the payment vouchers, that were submitted to the EPA for work performed by HRI, "involved *conscious* decisions rather than mere mistakes." (emphasis in original). The defendant suggests that deposition testimony of Ecology & Environment officials indicates that "[t]he EPA has paid, in full, every voucher submitted by E & E relating to construction of the groundwater treatment system." The government, thus, argues that the plaintiff's claim in this case is simply and strictly a matter between a prime contractor and a subcontractor.

The government additionally states that "this litigation presents only a dispute regarding a contractor's valuation of its subcontractor's costs." The government argues that this dispute arose because Ecology & Environment does not believe that HRI is entitled to the additional sum that it seeks, and that no direct action by the EPA gave rise to HRI's claim. The government cites *NavCom Defense Electronics, Inc. v. Ball Corporation,* 92 F.3d 877, 879 (9th Cir.1996), for the proposition "that a contracting officer lacks jurisdiction to resolve disputes between a subcontractor and the prime contractor" and argues that the dispute in the instant case is nothing more than a quarrel between a prime contractor and its subcontractor. The defendant concludes "that the EPA is entitled to judgment as a matter of law as this litigation does not fundamentally challenge the EPA's conduct, but rather involves an intramural dispute between E & E and HRI."

The plaintiff disputes the arguments propounded by the defendant that the government is entitled to summary judgment on the basis that the EPA paid whatever Ecology & Environment requested for payment under Change Order No. 22 and Alternate A.4. The plaintiff states that "[t]hose payments, however, are not dispositive of any of the claims in this case, as the record shows they merely constituted progress payments that were not offered or accepted as settlement or payment in full for Howard Robson's claims," and that "a request for final payment has not been made." Thus, the plaintiff claims that "[w]ithout final payment, none of Howard Robson's claims has been compromised or waived and, therefore, no factual basis exists for the entry of summary judgment in Defendant's favor."

Ecology & Environment further argues that the primary case cited by the government, *NavCom Defense Electronics, Inc. v. Ball Corp.,* 92 F.3d 877, is not applicable to the instant case because the Court of Appeals for the Ninth Circuit "rejected Nav-Com's argument that Ball's claims were covered by the CDA and must be submitted to the government's contracting officer and held that they were to be submitted to arbitration

under the subcontract." Instead, the plaintiff argues that the instant action more closely resembles an Armed Services Board of Contract Appeals (ASBCA) case, *Appeal of Turner Construction* 82–1 BCA ¶ 15,779 (May 5, 1982), which was finally decided in *United States v. Turner Construction Co.*, 827 F.2d 1554 (Fed.Cir.1987). According to Ecology & Environment, in *Turner Construction* the plaintiff's contract with the government was a cost-reimbursement contract, the plaintiff was the government's construction manager and the plaintiff submitted claims to the government on behalf of its subcontractors, although it had previously opposed those claims. Ecology & Environment argues that "Defendant is liable to Plaintiff to the same extent that Plaintiff is liable to Howard Robson on the merits of Howard Robson's claims," because in *Turner Construction* the government was required to pay the prime contractor on a cost reimbursement basis the amount that the prime was required to compensate the subcontractor.

The plaintiff also contends that the EPA had "extensive involvement in the creation of Howard Robson's claims." Ecology & Environment lists three pages of facts in its pleadings to argue that the defendant's involvement in creating HRI's claims created liability on the part of the government to the subcontractor, including: (1) on March 11, 1993 the defendant directed the plaintiff to issue a revised scope of work for the Alternates which it knew would require performance of a portion of the work under Alternate A.1; (2) the defendant adopted the plaintiff's recommendation that it delete the work that remained in Alternate A.1 and reinsert the work as a change to the base bid; (3) defendant anticipated that its decision would cause HRI to file a claim which defendant was prepared to pay if it agreed with the amount; and (4) the defendant refused to terminate HRI for convenience despite the plaintiff's suggestion. Based on these allegations, among others, the plaintiff states that the government was integrally involved in the controversy which underlies the instant case and, therefore, the defendant's motion for summary judgment should be denied.

Ecology & Environment also filed a cross-motion for partial summary judgment on the issue of entitlement, stating that it "has satisfied its burden of showing that no genuine issue of material fact exists." The plaintiff states that when a contract has provisions that provide for deletions of part of the work, those provisions must be followed. Thus, the plaintiff argues that "[b]ecause Howard Robson is entitled to payment for the work purportedly covered by Change Order [No.] 22 as a deductive change to Alternate A.1 under Article 12.3.F.2.d and e, Plaintiff is liable to Howard Robson for the unpaid portion of the net lump sum price for Alternate A.1." Ecology & Environment concludes that under the cost-reimbursement provisions of the subcontract, Ecology & Environment, on behalf of HRI, is entitled to recover on the claim.

According to the plaintiff, the government also is liable for the April 2, 1993 change order that included a revised site plan which allegedly doubled the amount of feet of pipe from that which had been estimated on the bid form and included three bends that were not on the bid form. The plaintiff claims that HRI should have been paid for the supply and installation of containment pipe at the corresponding subcontract unit prices for piping of that diameter and for the three bends that were added to the scope of the subcontract by the April 2, 1993 change order. In addition, because Ecology & Environment allegedly deleted from HRI's application for payment charges the cost of the three bends and substituted a lower unit price for a smaller diameter pipe, the plaintiff argues that HRI is owed for the bends in the pipe and for the diameter pipe which HRI actually installed. The plaintiff also states that "the Subcontract required Howard Robson to supply and install 564.5 feet of piping for free, and that is an untenable position." Ecology & Environment concludes:

Thus, Plaintiff is liable to Howard Robson for payment of the balance of the Subcontract price for all piping for which payments were not made and for payment for the three bends as additional work to the Subcontract. Because Plaintiff is liable to Howard Robson, Defendant like-

wise is liable to Plaintiff under the cost reimbursement provisions of the Contract, as Defendant is required to advance as reimbursable costs to Plaintiff whatever Plaintiff is required under the Subcontract to pay Howard Robson along with Plaintiff's base and award fees.

In its reply, the defendant reiterates its position by stating that "[t]he subcontract, which E & E devotes the majority of its brief discussing, bears no relevance to the issues to be decided in this litigation" because "the EPA paid every dollar requested by E & E upon behalf of its subcontractor, HRI." Moreover, the defendant states that "it was *solely* E & E that evaluated HRI's costs and determined what HRI was due" and "[a]ccordingly, HRI's dissatisfaction with E & E's valuation of its costs is a matter that is strictly between E & E and HRI." (emphasis in original). The defendant further states that *Turner Construction* is unlike the case at bar because in *Turner Construction* the ASBCA found that privity of contract existed between the government and the subcontractor, while here no privity exists between the government and HRI.

 Lacking privity of contract with the government, a subcontractor may not directly sue the United States in an ordinary government contract. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–52 (Fed. Cir.1983); *see also Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir. 1984). Therefore, a subcontractor without an independent basis for establishing privity with the government can seek redress only through the prime contractor. *See Erickson Air Crane Co. v. United States,* 731 F.2d at 813–814; *see also National Leased Housing Assoc. v. United States,* 105 F.3d 1423, 1435–36 (Fed.Cir.1997) (quoting *United States v. Johnson Controls, Inc.,* 713 F.2d at 1551) (noting "rare circumstances under which a subcontractor can sue the Government directly"). A prime contractor, on the other hand, has no basis for sponsoring such a suit unless it has paid the subcontractor, or remains liable to reimburse the subcontractor in the future. *United States v. Johnson Controls, Inc.,* 713 F.2d at 1552 n. 8. The prime contractor's suit is based on its liability

to the subcontractor for the government's damages to the parties. *Severin v. United States,* 99 Ct.Cl. 435, 443 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *J.L. Simmons Co. v. United States,* 158 Ct.Cl. 393, 397, 304 F.2d 886, 888 (1962). Thus, " 'unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime [contractor].' " *United States v. Johnson Controls,* 713 F.2d at 1550 (quoting *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 479 F.2d 1334, 1337 (1973)).

In a case brought by a contractor on behalf of a subcontractor, the validity of the claim in this court, however, is not premised on the prime contractor's judgment as to the strength of the claim. *United States v. Turner Constr. Co.,* 827 F.2d at 1561. "[H]ow the prime contractor itself would resolve the dispute should not be relevant to the certification issue; the prime contractor should not, through the requirement that it certify subcontractor claims, be used as a substitute for the contracting officer or the board in the determination of the merits of the submitted claims under the CDA." *Id.* Therefore as long as the claim certification is made in good faith and in substantial compliance, even though the contractor has neither paid the claim or admitted liability, a subcontractor may try to assert an appeal through the contractor. *See Transamerica Insur. Corp., Inc. v. United States,* 973 F.2d 1572, 1580 (Fed.Cir.1992).

The right of appeal of a subcontractor, through the prime contractor's name, however, is not meant to substitute for the resolution of liability issues arising between a contractor and its subcontractor. *See Performance Contracting, Inc. v. Seaboard Surety Co.,* 163 F.3d 366, 371 (6th Cir.1998) ("it is a well-established proposition that a contracting officer has no jurisdiction to resolve disputes between a general contractor and a subcontractor."); *NavCom Defense Electronics, Inc. v. Ball Corp.,* 92 F.3d 877, 880 (9th Cir.1996) ("The contracting officer has no jurisdiction to resolve disputes between a subcontractor and the prime con-

tractor.") (citing *U.S. West Communications Servs. v. United States*, 940 F.2d 622, 627 (Fed.Cir.1991)). The United States Court of Appeals for the Federal Circuit has addressed specifically the dispute relationship between a prime contractor and a subcontractor:

> A government contractor's dispute with its subcontractor was by definition specifically excluded from CDA coverage. Congress defined a "contractor" eligible to initiate an action before the board as "a party to a Government contract other than the Government." 41 U.S.C. § 601(4). This language was explained in Senate Report No. 1118:
>
>> The recommendations of the Procurement Commission specifically exclude bringing subcontractors under [the CDA].... By forcing the prime contractor to administer its subcontract network, the Government permits prime contractors and subcontractors at all tiers to use to some extent their familiar commercial procedures in contract award and administration.
>
> S. Rep. No. 1118, 95th Cong., 2d Sess. 16–17 (1978) U.S.Code Cong. & Admin. News 1978, pp. 5235, 5250, 5251. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1548–50 (Fed.Cir.1983).

*U.S. West Communications Servs. v. United States*, 940 F.2d at 627 (alterations in original).

In the instant action, the plaintiff asks the court to adopt the posture of the Armed Services Board of Contract Appeals in *Appeal of Turner Construction Co.*, 82–1 BCA ¶ 15,779 (May 5, 1982)[4] and *Appeal of Tur-*

*ner Construction Co.*, 84–1 BCA ¶ 16,996, 1983 WL 13481 (Nov. 25, 1983), which found that Turner Construction's "dual position as Government representative for some purposes and as a prime contractor for others" created jurisdictional liability on the part of the government for the prime contractor's actions. However, in *United States v. Johnson Controls, Inc.*, a related case involving the same facts as were presented in *United States v. Turner Construction Co.*, 827 F.2d 1554 (Fed.Cir.1987), and which plaintiff cites approvingly, the Court of Appeals for the Federal Circuit appears to have rejected the "agency" theory to create liability in that particular case:

> We reject the board's conclusion that the contract provisions so circumvented the independent authority of the prime contractor that Turner was acting as an agent of the government. It is true that the government here has retained a great deal of control over the action of Turner in its dealings with the subcontractors on the project. But it is also apparent that the government meant to use Turner as a buffer between it and the claims of the subcontractors. After all, it was Turner that was contractually bound to supervise and complete the construction project for a fixed price. Also, it was Turner, not the government who rejected Johnson's submittals ....

*United States v. Johnson Controls, Inc.*, 713 F.2d at 1552 (citation omitted).

Subsequently, the United States Court of Appeals for the Federal Circuit, in *U.S. West Communications Servs. v. United States*, 940 F.2d 622, further refined the discussion in

---

4. Ultimately, *Appeal of Turner Construction Co.*, 82–1 BCA ¶ 15,779 (May 5, 1982) was affirmed by *United States v. Turner Construction Co.*, 827 F.2d 1554 (Fed.Cir.1987). Initially, the ASBCA decision on the merits in *Appeal of Turner Construction Co.*, ASBCA No. 25714, 82–1 BCA ¶ 15,779 (May 5, 1982) had been vacated by the United States Court of Appeals for the Federal Circuit in *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983), because, as the Court of Appeals held, the ASBCA did not have jurisdiction over a direct appeal by the subcontractor Johnson Controls, Inc. Subsequently, the government appealed from a final decision of the ASBCA in *Appeal of Turner Construction Co.*, ASBCA No. 25714, 86–1 BCA ¶ 18,532, 1985 WL

17225 (Oct. 29, 1985). In *Appeal of Turner Construction Co.*, ASBCA No. 25714, 86–1 BCA ¶ 18,- 532, the ASBCA determined that a certified claim submitted by Turner Construction was sufficient to confer jurisdiction and reinstated the ASBCA's prior decision on the merits in *Appeal of Turner Construction Co.*, ASBCA No. 25714, 82–1 BCA ¶ 15,779 (May 5, 1982). In the final appeal, *United States v. Turner Constr. Co.*, 827 F.2d 1554, the Court of Appeals for the Federal Circuit held that the ASBCA properly assumed jurisdiction of Turner Construction's appeal and affirmed the ASBCA's granting of an equitable dollar adjustment to Turner Construction on behalf of the subcontractor.

*United States v. Johnson Controls, Inc.* on the requisite parameters of an agency relationship needed to create government liability to a subcontractor, as follows:

> Our decision in *Johnson Controls,* even though it dealt directly with the question of subcontractor privity for purposes of a Contract Disputes Act proceeding, examined the elements of an agency relationship. *See* 713 F.2d at 1551–52. We held that (1) a prime contractor must act as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor must be established by clear contractual consent, and (3) the contract must state that the government is directly liable for the purchase price.

*U.S. West Communications Servs. v. United States,* 940 F.2d at 629.

■ The instant action requires a factual determination of the nature of the dispute presented, specifically whether the dispute was simply between the prime contractor, Ecology & Environment, and the subcontractor, HRI, or whether the government also was involved in the dispute with the prime contractor and the subcontractor. There are a number of critical facts which demonstrate that the dispute at issue was a dispute between the prime contractor and its subcontractor and, therefore, is a potential liability of the prime contractor and not of the government. The parties have stipulated that Ecology & Environment did not act as the EPA's agent and, thus, the actions and conduct of Ecology & Environment cannot be imputed to the government. Moreover, the subcontract upon which HRI seeks an adjustment was not drafted by the government, is a subcontract between Ecology & Environment and HRI that does not contain the EPA as a party, and was not administered by the government. Furthermore, the items that HRI seeks to have adjusted were presented to Ecology & Environment under the subcontract, and Ecology & Environment independently elected to lower the dollar amount claimed by HRI, prior to their submission by Ecology & Environment to the government under the prime contract.

The plaintiff attempts to argue that the downward adjustments and deletions in the pricing costs submitted to the government for payment under the prime contract were "mistakes" on the part of Ecology & Environment. However, the deposition testimony of Ecology & Environment's regional manager and prime correspondent with HRI, Joseph F. Pearson, which was submitted as part of the record for summary judgment, indicates that the prime contractor, Ecology & Environment, independently and consciously decided to adjust these costs:

Q: [by Paul S. Padda, government counsel] Did the Government instruct you to cross that amount, the $328,000, and estimate the value of Howard Robson's work at $195,000?

A: [Mr. Pearson] They did not instruct us to do this, no.

Q: Okay. So it was Ecology and Environment's determination—singularly Ecology and Environment's determination, that that's what its subcontractor was owed?

\* \* \*

A: It was our action to cross it out. I believed at the time that EPA knew, you know, how we were handling the situation and what we were doing in terms of reducing the amounts of payment to Howard Robson at the time.

\* \* \*

Q: All right. Let me ask you the specifics of this. They've asked for $328,000. You came back with a figure of $195,000. That is a difference of $100,000.

A: Right.

\* \* \*

Q: ... HRI is asked for $328,000 here?

A: Right.

Q: You crossed out that amount and you put down $195,000?

A: Right.

Q: You asked the Government to pay Ecology & Environment $195,000 for work performed by Howard Robson. Is that correct?

**506**

A: That's correct.

Q: It was your opinion that Howard Robson was not entitled to the $328,000 that it was asking for. Is that correct?

A: That is correct.

Therefore, the subcontractor's dispute for additional payment is not with the government, but rather with the prime contractor. It was Ecology & Environment's election not to pass on a request for the total costs claimed by HRI under the subcontract to the government. The government, in fact, has paid for the costs associated with the phases of the contract that were presented to the government for payment by the prime contractor in their entirety. The fact that HRI protested to Ecology & Environment as to the cost adjustments, does not impute to the government those same protests, when the cost adjustments were undertaken independent of government supervision, and submitted as determined and altered by Ecology & Environment to the government for progress payment purposes.

The plaintiff's argument that the defendant was integrally and extensively involved in the contract performance construction controversies, which underlie the payment disputes, does not change the fact that the costs in dispute are premised solely upon a subcontract, to which the government was not privy. Moreover, under the subcontract, the prime contractor Ecology & Environment dictated the rate and amount of progress and payment requests submitted to the government during construction. The plaintiff has not provided evidence that demonstrates involvement on the part of the government to the extent that it can be said that the government assumed control over the construction project's subcontracts or that Ecology & Environment was an "agent" of the government. Significantly, it was Ecology & Environment which rejected the submittals from HRI and determined the amounts of the requests for payments submitted to the government. The government hired a prime contractor with expertise for the purpose of constructing the water treatment project and thereby created a legal barrier between the government and the subcontractor, including regarding disputes as to cost adjustments dictated by the prime contractor. *See United States v. Johnson Controls, Inc.,* 713 F.2d at 1552. Ecology & Environment's claim against the United States must be dismissed. Any disputes which remain must be resolved between the prime contractor Ecology & Environment and HRI.

## CONCLUSION

The plaintiff's motion for partial summary judgment is **DENIED**. The defendant's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**